CRAIG ZIENTARA, Plaintiff-Appellant, v. LONG CREEK TOWNSHIP *et al.*, Defendants-Appellees.

Fourth District   No. 4—90—0492

Opinion filed April 4, 1991.

228

Leahy Law Offices, of Springfield (Mary Lee Leahy, of counsel), for appellant.

Michael R. Cornyn and David E. Krchak, both of Thomas, Mamer & Haughey, of Champaign, for appellees.

JUSTICE SPITZ delivered the opinion of the court:

Plaintiff Craig Zientara appeals from a judgment entered against plaintiff and in favor of defendants Long Creek Township (Township), Bob Robertson, Barb Banfield, Dale Workman, Danny Rutherford, David Johnson, and Jeff Yount. During the jury trial conducted in the circuit court of Macon County, the trial judge directed a verdict at the close of plaintiff's evidence.

On appeal, plaintiff raises three issues. The first issue is whether the trial court improperly struck portions of counts I and II of plaintiff's complaint.

On August 3, 1987, plaintiff filed a three-count complaint against defendants. Count I alleged a cause of action for retaliatory discharge against the Township. Count II alleged civil rights violations against all the named defendants, while count III attempted to make an additional claim for damages against the township for civil rights violations. On January 4, 1988, plaintiff filed a first-amended complaint, also framed in three counts. On February 18, 1988, defendant moved to dismiss plaintiff's first-amended complaint.

Count I of plaintiff's first-amended complaint alleged as follows:

"1. Plaintiff, CRAIG ZIENTARA, is an adult resident of Macon County, State of Illinois.

2. Defendant, LONG CREEK TOWNSHIP, is a unit of local government established pursuant to the Constitution and statutes of the State of Illinois with its offices located in Macon County, State of Illinois.

3. Defendant operates a water department supplying water to various residents of the township.

4. At all times relevant hereto, Plaintiff enjoyed the rights set forth in Section 5 of Article I of the 1970 Illinois Constitution which reads:

'The people have the right to assemble in a peaceable manner, to consult for the common good, to make known their

opinions to their representatives and to apply for redress of grievances.'

5. Defendant is bound to act in accord with the requirements of the Freedom of Information Act, Ill. Rev. Stat., ch. 116, sec. 201 *et seq.*

6. Defendant is bound to act in accord with the requirements of the Environmental Protection Act, Ill. Rev. Stat., ch. 111½, sec. 1001, *et seq.* and the rules and regulations adopted pursuant to that act.

7. Defendant is bound to act in accord with the requirements of the federal Fair Labor Standards Act, 29 *U.S.C.* [§]201, *et seq.*

8. Defendant's compliance with the Constitution, Illinois statutes and regulations adopted thereunder and with federal statutes are matters of public policy of the State of Illinois.

9. In August 1985, Plaintiff was hired by Defendant to work in its water department; he continued to work there until he was fired on June 18, 1986.

10. On or about May 6, 1986, under the Freedom of Information Act, Ill. Rev. Stat., ch. 116, sec. 201 *et seq.*, Plaintiff sought information regarding the financial operation of the Defendant, particularly that of the water department.

11. Agents of Defendant objected to Plaintiff's seeking this information, but eventually did provide Plaintiff with the requested information.

12. In late 1985 and continuing through the date Defendant fired Plaintiff, Plaintiff repeatedly addressed the Defendant on matters of public policy and public concern including:

a. In the Spring of 1986 Plaintiff repeatedly called to the attention of the individual members of the Defendant Board the dangerous condition that existed in the Defendant's water tower, namely, that the tower was not enclosed, the screen was in bad shape and was rusted, and that the bolts had rusted; these conditions violated the standards set forth by the Environmental Protection Agency of the State of Illinois.

b. On June 10, 1986, Plaintiff addressed the members of the Board of Defendant and presented to the Board the following, much of which was based on the information he obtained through his request under the Freedom of Information Act:

(1) an analysis of the finances and operations of the water plant including a history of the use of outside contractors and an historical analysis of the amounts of money spent on parts and labor;

(2) an historical analysis of the relationship of the amount of the Superintendent's salary to the total salary of those working under the superintendent;

(3) an analysis of the various parts installed in the water plant while Plaintiff had been employed there.

c. In 1987 Plaintiff advised Defendant that the Defendant's method of compensating him for overtime violated the federal Fair Labor Standards Act, 29 U.S.C. [§]201 *et seq.* in that he was working overtime at a greater rate than he was being paid.

d. Between June 10, 1986, and June 18, 1986, Plaintiff discussed with the individual members of the Defendant's Board the following problems:

a. the superintendent's abuse of driving the Defendant's truck and using it for his personal use;

b. the superintendent's abuse of equipment at the water plant.

13. On June 18, 1986, Defendant fired Plaintiff.

14. Plaintiff was fired by Defendant because he had called the above described problems to the attention of the Defendant.

15. It is against the public policy of the State of Illinois for Defendant to fire Plaintiff for his calling to Defendant's attention the dangerous condition related to the water tower and the violations of the Environmental Protection Agency regulations.

16. It is against the public policy of the State of Illinois for Defendant to fire Plaintiff for his calling to Defendant's attention that the method of compensating for overtime violated the terms of the federal Fair Labor Standards Act.

17. It is against the public policy of the State of Illinois for Defendant to fire Plaintiff for calling to Defendant's attention the abuse of public monies and equipment owned by a public body.

18. It is against the public policy of the State of Illinois for Defendant to fire Plaintiff for exercising his rights as guaranteed him by Section 5 of Article I of the 1970 Illinois Constitution.

19. Defendant's firing of Plaintiff was against the public policy of the State of Illinois.

20. As a direct and proximate result of Defendant's firing of Plaintiff, Plaintiff has suffered loss of income and other fringe benefits, pain, suffering, humiliation and embarrassment, loss of reputation and loss of Plaintiff's ability to work and advance in his chosen employment."

On October 17, 1989, the trial court entered an opinion order relating to the motion to dismiss the first-amended complaint. With regard to count I, the trial court struck paragraph Nos. 4, 5, 6, 7, 10, 11, 12a, 12b, 12c, 15, 16, and 18.

Section 2—615 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—615) provides that motions objecting to pleadings specify the defects complained of and request appropriate relief, including, but not limited to, striking a portion of a pleading because it is substantially insufficient in law or dismissing the action. So far as the facts alleged in the complaint are well pleaded, a motion to strike a portion of a complaint or to dismiss a complaint in its entirety on the grounds of insufficiency creates an issue of law. (*Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495; *Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 424 N.E.2d 1271; *Midwest Glass Co. v. Stanford Development Co.* (1975), 34 Ill. App. 3d 130, 339 N.E.2d 274; *Hamer v. Village of Deerfield* (1975), 33 Ill. App. 3d 804, 338 N.E.2d 242.) Therefore, in determining the propriety of the trial court's ruling, the reviewing court is concerned only with the questions of law presented by the pleadings. (*Oswald v. Township High School District No. 214* (1980), 84 Ill. App. 3d 723, 406 N.E.2d 157.) To state a valid claim for retaliatory discharge, the former employee must allege the dismissal was in retaliation for the employee's activities and contravened a clearly mandated public policy. However, merely citing a constitutional or statutory provision is not sufficient in the absence of allegations demonstrating the public policy mandated by the cited provisions was violated by the discharge from employment. *Fellhauer* (1991), 142 Ill. 2d 495.

The Illinois Supreme Court first recognized the tort of retaliatory discharge in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, involving the discharge of plaintiff in retaliation for filing a workers' compensation claim. The court found the Workmen's Compensation Act (Act) (Ill. Rev. Stat. 1973, ch. 48, par. 138.1 *et seq.*) had a beneficent purpose and a remedial nature. By affording protection to employees in the form of prompt and equitable compensation for injuries, the Act promotes the general welfare of the State and its en-

actment was in the furtherance of sound public policy. Therefore, the cause of action for retaliatory discharge was recognized to exist to implement that public policy.

To determine the contours of the tort of retaliatory discharge, the Illinois Supreme Court subsequently considered *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876. The majority opinion in *Palmateer* explained that the tort recognized in *Kelsay* is an exception to the general rule that "at will" employment is terminated at any time for any or no cause, and the exception was created in recognition of the fact that unchecked employer power, like unchecked employee power, can present a threat to carefully considered and adopted public policy. The court then stated:

"By recognizing the tort of retaliatory discharge, *Kelsay* acknowledged the common law principle that parties to a contract may not incorporate in it rights and obligations which are clearly injurious to the public. (See *People ex rel. Peabody v. Chicago Gas Trust Co.* (1889), 130 Ill. 268, 294[, 22 N.E. 798, 803].) This principle is expressed forcefully in cases which insist that an employer is in contempt for discharging an employee who exercises the civic right and duty of serving on a jury. (*People v. Vitucci* (1964), 49 Ill. App. 2d 171, 172[, 199 N.E.2d 78, 79]; *People v. Huggins* (1930), 258 Ill. App. 238, 243; see also Ill. Rev. Stat. 1979, ch. 38, par. 155—3 (making it a contempt of court to fire or discipline an employee for attending court when subpoenaed as a witness).) But the Achilles heel of the principle lies in the definition of public policy. When a discharge contravenes public policy in any way the employer has committed a legal wrong. However, the employer retains the right to fire workers at will in cases 'where no clear mandate of public policy is involved' (*Leach v. Lauhoff Grain Co.* (1977), 51 Ill. App. 3d 1022, 1026[, 366 N.E.2d 1145, 1148]). But what constitutes clearly mandated public policy?

There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. (*Smith v. Board of Education* (1950), 405 Ill. 143, 147[, 89 N.E.2d 893, 896].) Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citi-

zen's social rights, duties, and responsibilities before the tort will be allowed. Thus, actions for retaliatory discharge have been allowed where the employee was fired for refusing to violate a statute. Examples are: *Petermann · v. International Brotherhood of Teamsters Local 396* (1959), 174 Cal. App. 2d 184, 344 P.2d 25 (for refusing to commit perjury); *Tameny v. Atlantic Richfield Co.* (1980), 27 Cal. 3d 167, 610 P.2d 1330, 164 Cal. Rptr. 839 (for refusing to engage in price-fixing); *Harless v. First National Bank* (W. Va. 1978), 246 S.E.2d 270 (for refusing to violate a consumer credit code); *O'Sullivan v. Mallon* (1978), 160 N.J. Super. 416, 390 A.2d 149 (for refusing to practice medicine without a license). It has also been allowed where the employee was fired for refusing to evade jury duty (*Nees v. Hocks* (1975), 272 Or. 210, 536 P.2d 512; *Reuther v. Fowler & Williams, Inc.* (1978), 255 Pa. Super. 28, 386 A.2d 119), for engaging in statutorily protected union activities (*Glenn v. Clearman's Golden Cock Inn, Inc.* (1961), 192 Cal. App. 2d 793, 13 Cal. Rptr. 769), and for filing a claim under a worker's compensation statute (*Sventko v. Kroger Co.* (1976), 69 Mich. App. 644, 245 N.W.2d 151; *Frampton v. Central Indiana Gas Co.* (1973), 260 Ind. 249, 297 N.E.2d 425).

The action has not been allowed where the worker was discharged in a dispute over a company's internal management system (*Keneally v. Orgain* (1980), ___ Mont. ___, 606 P.2d 127), where the worker took too much sick leave (*Jones v. Keogh* (1979), 137 Vt. 562, 409 A.2d 581), where the worker tried to examine the company's books in his capacity as a shareholder (*Campbell v. Ford Industries, Inc.* (1976), 274 Or. 243, 546 P.2d 141), where the worker impugned the company's integrity (*Abrisz v. Pulley Freight Lines, Inc.* (Iowa 1978), 270 N.W.2d 454), where the worker refused to be examined by a psychological-stress evaluator (*Larsen v. Motor Supply Co.* (1977), 117 Ariz. 507, 573 P.2d 907), where the worker was attending night school (*Scroghan v. Kraftco Corp.* (Ky. App. 1977), 551 S.W.2d 811), or where the worker improperly used the employer's Christmas fund (*Jackson v. Minidoka Irrigation District* (1977), 98 Idaho 330, 563 P.2d 54).

The cause of action is allowed where the public policy is clear, but is denied where it is equally clear that only private interests are at stake. Where the nature of the interest at stake is muddled, the courts have given conflicting answers as to whether the protection of the tort action is available. Com-

pare the inconsistent results where the discharge was for opposition to sexual discrimination or harassment (*McCluney v. Jos. Schlitz Brewing Co.* (E.D. Wis. 1980), 489 F. Supp. 24, and *Monge v. Beebe Rubber Co.* (1974), 114 N.H. 130, 316 A.2d 549), for refusal to falsify official reports (*Hinrichs v. Tranquilaire Hospital* (Ala. 1977), 352 So. 2d 1130, and *Trombetta v. Detroit, Toledo & Ironton R.R. Co.* (1978), 81 Mich. App. 489, 265 N.W.2d 385), and over internal company disputes regarding product safety (*Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174, and *Pierce v. Ortho Pharmaceutical Corp.* (1979), 166 N.J. Super. 335, 399 A.2d 1023)." (*Palmateer*, 85 Ill. 2d at 129-32, 421 N.E.2d at 878-79.)

At the conclusion of their analysis, the majority of the *Palmateer* court recognized the tort of retaliatory discharge applied to the termination of plaintiff's employment for supplying information to a local law-enforcement agency regarding possible violations of the criminal code, stating there is no public policy more basic to the concept of ordered liberty than the enforcement of a State's criminal code, which protects the lives and property of the citizens.

■ With regard to count I, the question which must be decided by this court is whether any of the allegations contained in the stricken portions of plaintiff's complaint fall within such a clearly mandated public policy as to give rise to a cause of action for retaliatory discharge. Initially, the plaintiff seeks to include all the allegations within the tort by suggesting that in firing plaintiff, the township violated plaintiff's rights under section 5 of article I of the Illinois Constitution, which states:

"The people have the right to assemble in a peaceable manner, to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." (Ill. Const. 1970, art. I, §5.)

Plaintiff seems to want this court to state that section 5 includes those rights guaranteed by the first amendment to the United States Constitution. However, the constitutional commentary by Robert A. Helman and Wayne W. Whalen states: "Section 5, along with Sections 3 and 4, are often said to be comparable to the First Amendment to the Federal Constitution even though the language is different." (Ill. Ann. Stat., 1970 Const., art. 1, §5, Constitutional Commentary, at 314 (Smith-Hurd 1971).) Defendant Township argues the reliance is inappropriate because nothing in the pleadings indicates plaintiff is a resident of the Township and so plaintiff could not be confronting his elected or appointed governmental representatives. Plaintiff, in his re-

ply brief, tries to counter this argument by suggesting he was a resident of the Township at the time of the incidents alleged, but he makes no reference to the record to demonstrate this fact was established before the trial court. In any event, plaintiff was an employee of the Township and, as such, could address the trustees. The question which must be decided, then, is whether the method of raising an issue with an employer, without consideration to the nature of the issue raised, will support a cause of action for retaliatory discharge.

Initially, reference to the constitutional commentary indicates that section 5 of article I alone does not embody all of the rights set forth in the first amendment. If plaintiff is attempting to allege that his right to freedom of speech as protected by the Illinois Constitution was abridged, then plaintiff must invoke section 4 of article I (Ill. Const. 1970, art. I, §4), which plaintiff has not done. Section 5 relates to the right to assemble and the right to petition for a redress of grievances. However, the rights of free speech and to petition for redress of grievances have both been determined by the Illinois Supreme Court not to be absolute rights, but conditional privileges. In *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 549-51, 229 N.E.2d 514, 517-18, the court had this to say:

> "Traditionally, the members of legislative and judicial bodies have been accorded absolute privilege in the performance of their official acts and duties (*Tenney v. Brandhove*, 341 U.S. 367, 95 L. Ed. 1019[, 71 S. Ct. 783]; *Larson v. Doner*, 32 Ill. App. 2d 471[, 178 N.E.2d 399]; 53 C.J.S. 193, Libel and Slander, par. 105), and it is clear that an individual citizen is similarly privileged to some extent in his appearances and actions before these bodies. This is the only judicial posture that can be maintained and remain consistent with the constitutional guarantees of free speech and the right to petition for redress of grievances. (U.S. Const., amend. I, and amend. XIV, sec. I; Ill. Const., art. II, secs. 4 and 17.) Furthermore, these rights of Federal and State citizenship are applicable at Federal, State and municipal levels of government in an undiluted form. *Larson v. Doner*.

> The precise question involved herein is to what extent the acts of a private citizen petitioning his local legislative body are privileged. In resolving this question we are mindful that the rights of free speech and petition have been jealously guarded by our courts, at State and Federal levels, as basic to the very concept of representative government, and that, generally, 'The

right of the people to inform their representatives in government of their desires with regard to the passage or enforcement of laws cannot properly be made to depend upon their intent in so doing.' (*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464[, 81 S. Ct. 523].) However, these rights of the individual are not inherently absolute but must be considered in the light of the rights of others, (*United Public Workers of America v. Mitchell*, 330 U.S. 75, 91 L. Ed. 754[, 67 S. Ct. 556]; *Times Film Corp. v. City of Chicago*, 365 U.S. 43, 5 L. Ed. 2d 403[, 81 S. Ct. 391]; *Baines v. City of Damville*, (4th cir.) 337 F.2d 579) and there are instances where persons, in the exercise of these freedoms, can be subjected to civil liability for their acts or utterances, as in the case of an otherwise privileged libel where there is proof that it was motivated by actual malice. (*New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686[, 84 S. Ct. 710]; *Rosenblatt v. Baer*, 383 U.S. 75, 15 L. Ed. 2d 597[, 86 S. Ct. 669].) These holdings establish that the right of free speech is not absolutely but only conditionally privileged. We believe that the right of petition should likewise be construed as only conditionally privileged for 'It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, \*\*\* and are therefore united in the First Article's assurance.' *Thomas v. Collins*, 323 U.S. 516, 530, 89 L. Ed. 430, 440[, 65 S. Ct. 315, 323].

We hold that a private citizen's acts pursuant to his right to petition a legislative body, be it local or otherwise, are conditionally privileged. It therefore becomes necessary to determine what type or degree of acts by such citizen are outside the ambit of the privilege and, consequently, actionable in an appropriate civil suit. Most courts have held, as the parties hereto agree, that in a tort action for interference with contract wherein the alleged wrongful conduct is conditionally privileged, the plaintiff must show actual malice on the part of the defendant in order to sustain such a cause of action. (*Vanarsdale v. Laverty*, 69 Pa. 103; *McKee v. Hughes*, 133 Tenn. 455, 181 S.W. 930; *Middlesex Concrete Products & Excavating Corp. v. Carteret Industrial Ass'n*, 37 N.J. 507, 181 A.2d 774.) Moreover, we have held in the previously analogized situation

involving a tort action for defamation, based on alleged wrongful conduct which is similarly conditionally privileged, that a plaintiff, to state a cause of action, must show that defendant's wrongful conduct was motivated by actual malice. (*Lulay v. Peoria Journal-Star.*) With these standards in mind, we proceed to the consideration of the ultimate issue of whether the plaintiff has stated a cause of action in its amended complaint."

In addition, the United States Supreme Court in *Connick v. Myers* (1983), 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684, considered whether the right to free speech could be invoked to prevent the termination of an assistant District Attorney who expressed her opposition to a transfer and then, by use of a questionnaire, solicited the views of fellow employees concerning the office transfer policy, office morale, the need for a grievance committee, the level of confidence in the supervisors, and whether employees felt pressured to work in political campaigns. Her employment was terminated because of her refusal to accept the transfer and because the distribution of the questionnaire was an act of insubordination. In the *Connick* decision the majority opinion decided that where a public employee is speaking, not as a citizen on a matter of public concern, but as an employee addressing only matters of personal interest, in the absence of unusual circumstances, it is not appropriate for the court to review the personnel decisions of a public agency.

Since the Illinois Supreme Court has indicated that the right to petition for redress of grievances is conditioned similarly to the right to free speech, then it is logical that being fired for petitioning for redress of personal grievances, as opposed to redress of matters of public concern, should not support court action. In short, the method of raising the issue ought not control. Instead, the question of whether the facts in this case support a court action for retaliatory discharge depends not on the fact the plaintiff raised the issues before the board of trustees, but whether plaintiff sought to raise issues of such public concern that, as a matter of public policy, plaintiff should not be inhibited from raising such issues by threat of termination of employment.

In order to determine whether the stricken portions of the complaint state valid causes of action for retaliatory discharge, this court must ascertain what, if any, public policy is involved. If some statutory provision is involved, then the public policy of the statute should be considered by resorting to legislative history, its purpose and language, and the effect of the provision. (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 478 N.E.2d 1354.) A matter falls within

the definition of "clearly mandated public policy" if it strikes at the heart of the social rights, duties, and responsibilities of a citizen. *Price v. Carmack Datsun, Inc.* (1985), 109 Ill. 2d 65, 485 N.E.2d 359.

■■ Plaintiff alleges that he received from the Township certain information relating to finances and operations through the Freedom of Information Act. (Ill. Rev. Stat. 1989, ch. 116, par. 201 *et seq.*) The request was made on May 6, 1986. After receiving that information, plaintiff then made a presentation to the Township board of trustees, allegedly based on the information so obtained. The Freedom of Information Act does address the rights of persons to inspect and copy public records, with certain exceptions. However, by its very language it is obvious the Freedom of Information Act pertains only to the availability of such information and does not in any way protect the use of the information once received. Plaintiff does not allege he was fired because he requested the information. Plaintiff alleges he was fired because of the use he made of the information. Section 1 of the Freedom of Information Act states in part:

> "Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest.
>
> This Act is not intended to be used to violate individual privacy, nor for the purpose of furthering a commercial enterprise, or to disrupt the duly-undertaken work of any public body independent of the fulfillment of any of the fore-mentioned rights of the people to access to information." Ill. Rev. Stat. 1989, ch. 116, par. 201.

■■ While the Freedom of Information Act does create a public policy concerning the availability of information from public officials and the need to have an informed public monitoring government, the Freedom of Information Act does not suggest any public policy concerning whether the information, once obtained, can be used as plaintiff did in the case at bar, with the exception of enabling people to discuss public issues fully and freely. This would appear to be no greater deterrence to termination of employment than are the rights

to free speech and to petition for redress of grievances. The right to discuss fully and freely is not unconditional. In any event, reference to the Freedom of Information Act is unnecessary surplusage.

Plaintiff alleged his presentation to the board of trustees included an analysis of the finances and operation of the water plant, including (1) an historical analysis of the use of outside contractors and monies expended on parts and labor, (2) the relationship of the superintendent's salary to the salary of the employees, and (3) parts installed in the plant while plaintiff was employed. If it is reasonable for an employer to determine that plaintiff was being disruptive and insubordinate, then, as the United States Supreme Court indicated, the rights to freedom of speech and to petition for redress of grievances and the right to freely and fully discuss public issues may not be utilized to invoke court system interference in personnel matters.

■ Generally, the operation of the water plant is a matter of public concern and not a private issue. The allegations, however, are conclusory. It cannot be determined from the pleading whether plaintiff is merely disagreeing with the way in which the trustees spend money, which would be insubordinate, or whether plaintiff is disclosing fraud, misuse of funds, or other breaches of public trust, which would support an action for retaliatory discharge. Therefore, if the issue is properly pleaded, whether plaintiff was being disruptive or insubordinate is a question of fact which could not be disposed of on a motion to strike. Plaintiff should have been allowed to replead paragraph No. 12b.

■ ■ On the other hand, plaintiff's claim to being inadequately paid for overtime, even if allegedly based on the Fair Labor Standards Act of 1938 (29 U.S.C. §201 *et seq.* (1982)), is a personal matter. First of all, the Fair Labor Standards Act of 1938 applies to labor conditions in industries engaged in commerce or production of goods for commerce. (29 U.S.C. §202 (1982).) Plaintiff cites no authority indicating that defendant Township is subject to the Act. Second, even assuming the Act applied, the provision cited in plaintiff's brief has no applicability. Section 215(a)(3) states:

"(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

\* \* \*

(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in

any such proceeding, or has served or is about to serve on an industry committee." (29 U.S.C. §215(a)(3) (1982).)

Since plaintiff did not institute or cause to be instituted a proceeding under or related to this chapter or testify in such a proceeding, there can be no violation of any public policy stated in the Act. In any event, wage disputes are personal matters, not matters of public concern and, as a result, there is not a clearly mandated public policy which allows plaintiff to raise this issue as he did.

The final allegation of count I which needs to be considered by this court relates to plaintiff's charges before the board of trustees that conditions existed in the defendant Township's water tower which violated standards set forth by the Illinois Environmental Protection Agency (IEPA). Plaintiff does not specify which standards were allegedly violated. Instead, plaintiff relies on language in section 2 of the Environmental Protection Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1002), wherein the Illinois General Assembly specifically found that environmental damage seriously endangers the public health and welfare and that private as well as governmental remedies must be provided in order to increase public participation in protecting the environment and to alleviate the burden on enforcement agencies while assuring a full hearing to all interests.

■■■ ■ Plaintiff does not cite any authority stating the method he employed was a recognized private remedy. As the trial judge stated, one can have no objection to "whistle blowers" acting in good faith. The trial court, however, would restrict the cause of action to those who alleged malfeasance rather than merely challenging discretion in the operation of the governmental body. However, if defendant Township is ignoring environmental regulations, that might be considered a violation of public trust. An employee may have the duty to inform his employer of circumstances which could possibly result in liability to the Township. As an employee, the right to raise these issues is subject to the condition that the employee cannot be insubordinate or disruptive. But whether plaintiff was insubordinate or disruptive cannot be determined as a matter of law on the face of the complaint unless this court finds the raising of these issues to the board of trustees establishes that plaintiff was insubordinate or disruptive. Again, whether plaintiff was insubordinate or disruptive is a question of fact. Therefore, the trial court improperly struck the allegations in count I relating to complaints of violations of IEPA regulations.

Defendant Township tries to convince this court to consider the striking of references to IEPA regulation violations in count I as

harmless because the trial court allowed reference to these allegations in count II. However, count II is quite a distinct cause of action from that sought to be raised in count I, as will be discussed. Moreover, it seems inconsistent to rule the same issue is a matter of public concern for one count, but not another. Nevertheless, further discussion of this question will be reserved until after consideration of whether the trial judge properly directed a verdict.

■ Finally, defendant Township contends administrative agencies such as the IEPA cannot establish public policy. Agencies create regulations pursuant to legislative authority. As a general rule, it is legislative authorization that creates the public policy. So the Environmental Protection Act creates the public policy under which IEPA promulgates regulations. While the regulations do not establish public policy, they effectuate public policy, and under the public policy announced by the legislature, a citizen may have the right and obligation to call attention to such violations. Therefore, it is the clearly mandated public policy of this State to allow employees to call attention to such violations without being discharged in retaliation therefor. The trial court improperly struck paragraphs 6, 12a, and 15 of count I.

Count II of plaintiff's first-amended complaint attempted to allege a cause of action against the Township and individual defendants under section 1983 of title 42 of the United States Code. (42 U.S.C. §1983 (1982).) The trial court ordered stricken paragraph Nos. 6, 7, 9, and 10 of count II, which stated as follows:

"6. On or about May 6, 1986, under the Freedom of Information Act, *Illinois Revised Statutes*, chapter 116, section 201, *et seq.*, Plaintiff sought information regarding the financial operation of the Defendant, particularly that of the water department.

7. Defendants objected to Plaintiff[']s obtaining his information, but eventually the requested information was provided Plaintiff.

\*\*\*

9. On June 10, 1986, Plaintiff addressed the individual Defendants in a Board meeting and presented the following, much of which was based on the information he obtained through his request under the Freedom of Information Act:

a. an analysis of the finances and operations of the water plant including a history of the use of outside contractors and an historical analysis of the amounts of money spent on parts and labor;

b. an historical analysis of the relationship of the amount of superintendent's salary in relationship to the total salary of those working under the superintendent;

c. an analysis of the various parts installed in the water plant while Plaintiff had been employed there.

10. In 1987 Plaintiff repeatedly advised agents of the Defendant Township that the Defendant Township's method of compensating him for overtime violated the federal Fair Labor Standards Act, 29 U.S.C. [§]201, *et seq.* in that he was working overtime at a greater rate than he was being paid."

On appeal, plaintiff does not argue the trial court's striking the wage claim was in error. Plaintiff directs the court's attention only to the analysis of finances which plaintiff made to the board of trustees as being a matter of sufficient public concern to form the basis of a section 1983 action in the event he proves he was discharged for that reason.

Section 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (42 U.S.C. §1983 (1982).)

State courts have concurrent jurisdiction and may enforce section 1983. *Bohacs v. Reid* (1978), 63 Ill. App. 3d 477, 379 N.E.2d 1372; *Alberty v. Daniel* (1974), 25 Ill. App. 3d 291, 323 N.E.2d 110.

According to plaintiff, the stricken portions of count II state a cause of action under section 1983 since the allegations indicate plaintiff was discharged from his employment because of the exercise of his right to free speech on the issues of department finances and operation. With regard to discharging a public employee for speech, the United States Supreme Court in *Rankin v. McPherson* (1987), 483 U.S. 378, 383-90, 97 L. Ed. 2d 315, 324-28, 107 S. Ct. 2891, 2896-2900, had this to say:

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. *Perry v. Sindermann*, 408 U.S. 593, 597[, 33 L. Ed. 2d 570, 577, 92 S. Ct. 2694, 2697] (1972). Even though McPherson was merely a probationary employee, and even if she could have been discharged

for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression. See *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 284-285[, 50 L. Ed. 2d 471, 481-82, 97 S. Ct. 568, 574-75] (1977); *Perry v. Sindermann, supra*, at 597-598[, 33 L. Ed. 2d at 577, 92 S. Ct. at 2697-98].

The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering v. Board of Education*, 391 U.S. 563, 568[, 20 L. Ed. 2d 811, 817, 88 S. Ct. 1731, 1734-35] (1968); *Connick v. Myers*, 461 U.S. 138, 140[, 75 L. Ed. 2d 708, 715, 103 S. Ct. 1684, 1686] (1983). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers*, concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, 'the threat of dismissal from public employment is *** a potent means of inhibiting speech.' *Pickering*, 391 U.S., at 574[, 20 L. Ed. 2d at 820, 88 S. Ct. at 1737]. Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

## A

The threshold question in applying this balancing test is whether McPherson's speech may be 'fairly characterized as constituting speech on a matter of public concern.' *Connick*, 461 U.S., at 146[, 75 L. Ed. 2d at 719, 103 S. Ct. at 1690]. 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' *Id.*, at 147-148[, 75 L. Ed. 2d at 720, 103 S. Ct. at 1690]. *** Our view of these determinations of the courts below is limited in this context by our constitutional obligation to assure that the

record supports this conclusion: ' " '[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they [were] made to see whether or not they *** are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " ' *Connick, supra,* at 150, n.10[,75 L. Ed. 2d at 722, n.10, 103 S. Ct. at 1692, n.10], quoting *Pennekamp v. Florida,* 328 U.S. 331, 335[, 90 L. Ed. 1295, 1297-98, 66 S. Ct. 1029, 1031] (1946) (footnote omitted).

Considering the statement in context, as *Connick* requires, discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President. While a statement that amounted to a threat to kill the President would not be protected by the First Amendment, the District Court concluded, and we agree, that McPherson's statement did not amount to a threat punishable under 18 U.S.C. §871(a) or 18 U.S.C. §2385, or, indeed, that could properly be criminalized at all. See 786 F.2d, at 1235. *** The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. '[D]ebate on public issues should be uninhibited, robust, and wideopen, and *** may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co. v. Sullivan,* 376 U.S. 254, 270[, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710, 721], (1964); see also *Bond v. Floyd,* 385 U.S. 116, 136[, 17 L. Ed. 2d 235, 247, 87 S. Ct. 339, 349] (1966): 'Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.'

### B

Because McPherson's statement addressed a matter of public concern, *Pickering* next requires that we balance McPherson's interest in making her statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' 391 U.S., at 568[, 20 L. Ed. 2d at 817, 88 S. Ct. at 1734-35]. The State

bears a burden of justifying the discharge on legitimate grounds. *Connick*, 461 U.S., at 150[, 75 L. Ed. 2d at 722, 103 S. Ct. at 1692].

In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. See *id.*, at 152-153[, 75 L. Ed. 2d at 723-24, 103 S. Ct. at 1693]; *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 415, n.4[, 58 L. Ed. 2d 619, 624, n.4 99 S. Ct. 693, 696, n.4] (1979). We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Pickering*, 391 U.S., at 570-573[, 20 L. Ed. 2d at 818-20, 88 S. Ct. at 1736-37].

These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest. From this perspective, however, petitioners fail to demonstrate a state interest that outweighs McPherson's First Amendment rights. While McPherson's statement was made at the workplace, there is no evidence that it interfered with the efficient functioning of the office. The Constable was evidently not afraid that McPherson had disturbed or interrupted other employees—he did not inquire to whom respondent had made the remark and testified that he 'was not concerned who she had made it to,' Tr. 42. In fact, Constable Rankin testified that the possibility of interference with the functions of the Constable's office had *not* been a consideration in his discharge of respondent and that he did not even inquire whether the remark had disrupted the work of the office.

Nor was there any danger that McPherson had discredited the office by making her statement in public. McPherson's speech took place in an area to which there was ordinarily no public access; her remark was evidently made in a private conversation with another employee. There is no suggestion that any member of the general public was present or heard

McPherson's statement. Nor is there any evidence that employees other than Jackson who worked in the room even heard the remark. Not only was McPherson's discharge unrelated to the functioning of the office, it was not based on any assessment by the Constable that the remark demonstrated a character trait that made respondent unfit to perform her work.

While the facts underlying Rankin's discharge of McPherson are, despite extensive proceedings in the District Court, still somewhat unclear, it is undisputed that he fired McPherson based on the *content* of her speech." (Emphasis in original.)

As will be discussed, the record in the case at bar presents evidence with regard to the reason the plaintiff was discharged by the Township. However, plaintiff was prevented from raising this particular issue because of the granting of the motion to strike. It may well be that, even had this issue gone to trial, the result would have been no different. On the other hand, with additional evidence, perhaps plaintiff could prevail.

■■■ The trial court's ruling on the motion to strike, however, relies on finding, as a matter of law, that the speech of plaintiff contained no matters of public concern. Certainly, the operation of the water department and its finances is a matter of public concern, or may be. People whose taxes support the Township should be concerned. Even the pay of department employees, in general, may be a matter of public concern. This should be distinguished, however, from plaintiff's claim for insufficient pay for overtime which pertains to him alone. Therefore, the striking of paragraph 9 of count II is error. The additional paragraphs stricken have no bearing on this question. Paragraph Nos. 6 and 7 relate to the Freedom of Information Act and plaintiff's obtaining information after an initial objection by defendants. This is surplusage. Paragraph No. 10 relates plaintiff's complaint for insufficient pay for overtime, matters of personal and not public concern.

The next issue to consider is whether the trial court improperly dismissed count III of plaintiff's complaint. Count III of plaintiff's complaint was dismissed in its entirety by the trial court. Count III also attempted to state a cause of action against defendant Township under section 1983. The operative paragraphs state as follows:

"6. In the spring of 1986, Plaintiff actively promoted union membership and collective bargaining for the employees of the Defendant Township; in particular Plaintiff talked with union representatives and urged the clerical employees of the Defendant Township to consider joining a union.

7. At all times relevant hereto, Plaintiff was entitled to exercise his rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

8. The promotion of union membership and collective bargaining for public employees are acts protected by the First and Fourteenth Amendments to the United States Constitution.

9. Defendants ROBERTSON, BANFIELD, WORKMAN, RUTHERFORD, JOHNSON and YOUNT fired Plaintiff because he had exercised his rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution; said firing violated Plaintiff's rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.''

■ Plaintiff contends he has a constitutional right to join and promote membership in a union under the rights to freedom of speech and association guaranteed by the first amendment of the United States Constitution and applied to the States through the fourteenth amendment. The defendants, and the trial court, rely on the fact that, as a unit of local government, the defendant Township is not subject to the Labor Management Relations Act of 1947 (29 U.S.C. §141 *et seq.* (1982)) or the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1989, ch. 48, par. 1601 *et seq.*). The Federal act specifically exempts States and political subdivisions thereof from the definition of "employer." (29 U.S.C. §152(2) (1982).) The Illinois Public Labor Relations Act is expressly inapplicable to local governments employing less than 35 employees, unless bargaining units were in existence prior to the effective date of the act. Ill. Rev. Stat. 1989, ch. 48, par. 1620(b).

■ Nothing in the complaint sets forth the number of employees of the Township. Defendants' motion is a combined motion to dismiss under sections 2—615 and 2—619 of the Code (Ill. Rev. Stat. 1989, ch. 110, pars. 2—615, 2—619). Attached to the motion is the affidavit of David F. Johnson, Township supervisor, which states that, at the time of the events alleged in the complaint, there were no collective-bargaining units or collective-bargaining agreements in existence pertaining to Township employees and that the Township employed less than 25 individuals. Plaintiff therefore has no right to require defendant Township to recognize a collective-bargaining unit. There being no recognized right to enforce, the trial court properly dismissed count III of plaintiff's complaint.

The final issue is whether the trial court committed reversible error by directing a verdict at the close of plaintiff's evidence. Certainly, the right to a jury trial is not impaired by the directing of a verdict since a right to a jury verdict exists only when the evidence presents a factual dispute of some substance. The determination of whether the evidence is sufficient is a matter for the jury, as trier of fact, once the trial judge has decided whether there is any evidence which raises a factual dispute. As a result, the standard of review in cases in which, after hearing the evidence, the trial judge removed the case from the consideration of the jury by directing a verdict, or overturned the jury's verdict by entering a judgment *n.o.v.*, is different than it is when the trier of fact, whether jury or judge, has been allowed to make a decision on the evidence. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the Illinois Supreme Court stated that verdicts are to be directed only in cases when all the evidence, viewed in its aspect most favorable to the opponent to the motion for directed verdict, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand.

In the case at bar, the cause proceeded to a jury trial on the portions of counts I and II not stricken by the trial court. At the close of plaintiff's case in chief, the trial court directed a verdict in favor of defendants. Therefore, in light of the *Pedrick* standard, the plaintiff's evidence must be reviewed.

At the trial, the first witness to testify was David F. Johnson, Township supervisor. Johnson was elected to that position in 1985. At the time he took office, there were problems with the quality of the water supplied to the Township by the Township water department because the water lines had not been flushed, the water tower had not been cleaned, and the water was not tested properly at the water plant. In addition, the water-plant building was deteriorated.

On Johnson's recommendation, the Township board of trustees hired Jeff L. Yount to be superintendent of the Township water department. Yount reported to Johnson, but Yount had authority to hire and fire employees of the water department. Yount hired plaintiff to work in the water department and advised Johnson he was happy with the quality of plaintiff's work.

In the spring of 1986, Johnson had a couple of conversations with plaintiff. Johnson advised Yount of those conversations. Also in the spring of 1986, plaintiff spoke at a public meeting of the board of trustees, describing the conditions inside the water tower. In May or June 1986, Johnson had a conversation with Yount in which Johnson

recommended that plaintiff be discharged from employment. This conversation took place after May 30, when plaintiff cheated on his time sheet. Johnson, admitted, however, that plaintiff was not fired until June 18.

In further testimony, Johnson clarified that concerning plaintiff's conversations with him, he advised Yount that plaintiff had some petty "gripes" about problems at the water plant. Johnson did not remember what the petty gripes were and did not recall if he relayed that information to Yount. He did recall a complaint about the use of the water truck. There had been a long-standing policy that the superintendent was allowed to use the truck so that tools and equipment were available in the event there was an emergency at night. Johnson explained this policy to plaintiff. Johnson did not feel plaintiff's complaint was legitimate. It was very possible Johnson discussed this matter with Yount.

The second witness to testify was Robert D. Robertson, a Township trustee from 1985 to 1989. Robertson recalled plaintiff, while he was an employee in the water department, speaking at a public meeting of the Township board of trustees about the condition of the water tower. In addition, during the spring of 1986, plaintiff had two or three conversations with Robertson about Yount's conduct. Plaintiff complained that Yount was reckless with the water department truck. Robertson informed Johnson about these conversations with plaintiff.

Robertson testified plaintiff complained about Yount's driving the truck at a high rate of speed and in such a way that the truck "was going to be torn up if he didn't get it stopped." Plaintiff did not say any damage had been done. Robertson advised plaintiff that the truck was Yount's responsibility and, if the truck was damaged, Yount would have to answer to the board of trustees.

With regard to the condition of the water tower, plaintiff's report was pretty much as expected. It was dirty, had rust and sediment in it and was in bad condition. The information was expected because that was a natural condition for a tower that had been in service for as long as that one had been. Robertson admitted that at the time plaintiff cleaned the water tower, it had not been cleaned since it was built over 12 years earlier.

The final adverse witness to testify was Yount. Yount was hired as the superintendent of the water department in July 1985. At that time, the Township operated a water tower serving 850 customers and maintained about 40 miles of water lines. Yount realized the water department was "in pretty bad shape." He fired the only full-

time employee, and about six or seven weeks after starting as superintendent, he hired plaintiff.

There were regulations of the IEPA which had to be met regarding water quality. When Yount began as superintendent, the Township had a problem with the IEPA regarding sludge. The problem existed when he began and continued afterward.

In addition to plaintiff, from time to time there would be some "general assistance people" working in the water department. In addition, there was a "green thumb worker," provided under a program to provide work for elderly people near retirement who have become unemployed and unable to get employment.

Yount and plaintiff worked side by side, doing the same type of work, putting in water service, reading meters, cleaning ground storage towers and elevator storage towers, painting the ceiling in the water-treatment plant, sandblasting and painting the holding tank for the filter, operating and maintaining the treatment plant, filling work orders, processing customer- relations papers, checking leaks, and taking monthly water samples for the IEPA. In late April or early May, plaintiff climbed the water tower to clean it out. Plaintiff hosed it out with a fire hose. A volunteer fireman named Jim Wooters helped plaintiff get the hose up there. The tower is about 130 feet from the ground to the top of the tower. It took plaintiff six or seven hours to do the job.

When plaintiff came down, he told Yount of the condition he found. It was plaintiff's opinion that the rust caused a serious material defect and that the tower was unsafe, Yount discounted plaintiff's opinion because plaintiff was not a structural engineer and the IEPA inspects the water tower every two years. Plaintiff also told Yount there was sludge at the bottom of the tower. Yount did not believe this would cause a problem as far as IEPA standards, but an individual customer might object to a change in water clarity. The tower had not been cleaned for 11 or 12 years. Yount recognized that the American Water Workers Association (AWWA), a group of licensed water-plant operators and engineers, recommends that such a tower be cleaned every five years. Plaintiff spoke to the board of trustees at the May 1986 meeting about what he found in the tower. Yount recommended to the board of trustees that the budget should reflect the need to sandblast and paint the tower pursuant to the AWWA recommendations. It was Yount's understanding at that time the sandblasting would require the Township to utilize the services of an engineer. He has since learned that is not so. Yount did not recall plaintiff telling him the lock on the entryway of the tank had to be

sawed off for plaintiff to get into it. At the time of the trial, over four years later, the tower had not been sandblasted or painted. Yount explained they cleaned it out a month before the hearing, but not the "bowl part" which contains 99% of the water. That is the part where plaintiff found the rust and the sludge. No one has been up in the bowl part since plaintiff was there in 1986. Yount explained his belief that most of the debris settled to the bottom of the tower, which is at ground level and which has been cleaned out.

When Yount interviewed plaintiff in 1985, he explained to plaintiff there would be overtime required in the event problems develop during the evenings or on the weekends which require immediate attention. By January 1986, plaintiff accumulated 100 hours overtime. Yount then instituted a policy whereby plaintiff was immediately paid for 20 hours of overtime and then paid for 10 hours of overtime on every paycheck. Yount did not recall the amount of accumulated overtime plaintiff had remaining at the time plaintiff was discharged.

Prior to the May 1986 meeting, Yount had talked to Johnson about once each week, on Monday mornings. However, after that meeting when discussing plaintiff's termination, they met just about every other day. He first talked to Johnson about terminating plaintiff right after the May meeting, about the last week in May.

Yount had never given plaintiff any written reprimands. They had had some arguments, but it was basically true to say that Yount had not told plaintiff he was not getting things done as he should have. Yount had never taken disciplinary action against plaintiff. Plaintiff was fired on June 18, 1986, immediately after a telephone conversation with Johnson in which Johnson told Yount to go ahead and fire plaintiff and no reason need be given.

During the last week of plaintiff's employment, his working hours were reduced. About three or four days before he was fired, plaintiff came into work one morning and Yount had him work only one hour before sending him home. On another day, Yount had plaintiff work two hours in the morning, go home, and come back to work two hours in the afternoon. During the last week, Yount put plaintiff to work cleaning the lime pits. He had plaintiff do that alone even though plaintiff had never done that alone before. Previously, plaintiff was always helped by Yount, a green-thumb worker, or a general-assistance worker. On plaintiff's final day, about 30 minutes after plaintiff was working alone in the lime pits, Yount called him out and told him he was fired. Afterward, as plaintiff was leaving, Yount met him in the parking lot and told him he had to learn about society.

At the time plaintiff was fired he was earning $6.36 per hour. Yount hired a replacement for plaintiff at $9 per hour.

As clarification, Yount explained the sludge problem to which he had previously referred. The Township water-treatment plant uses a lime softening process, and lime sludge was a by-product. The facilities were not adequate to handle the sludge, and two or three people were required to shovel out the lime pits every other week. The sludge waste was discharged into the creek, which flowed into Lake Decatur, raising Lake Decatur's raw water hardness. The Township is in the process of building a facility to alleviate the problem. The problem with the IEPA had nothing to do with the water tower. To Yount's knowledge, there has never been an IEPA problem involving the water tower. Since plaintiff left, the water department has been inspected twice and has not been cited for any problem with the water tower.

Yount asked plaintiff to clean out the water tower to clean the sediment out of the tank. This has to be done periodically. The AWWA standard recommending cleaning every five years has not been adopted by the IEPA. The IEPA does not require the tower to be painted, but if it is painted there should be a record that the paint used was "nontoxic, nonlead, IEPA public health approved paint."

Yount explained that he had several conversations with Johnson after the April board meeting. However, not until after Yount saw plaintiff's time slips for the last week in May did Yount mention to Johnson that he wanted to fire plaintiff.

With regard to paying $9 per hour for plaintiff's replacement, Yount explained the new employee was fully licensed to run the water-treatment plant and had 10 years' experience in water-department work. Yount also explained that, although he did not give plaintiff a reason for firing him, he did have a reason. Yount explained plaintiff had falsified all his time slips on several occasions, his job performance was unsuitable, and he spent an "immense" amount of time talking to secretaries and griping to Yount about the board of trustees not giving him a big enough raise and how he was worth much more money. Nevertheless, Yount admitted he did not call any of these problems to plaintiff's attention or reprimand or discipline plaintiff.

Plaintiff testified on his own behalf. Plaintiff explained his educational and employment history prior to going to work for the Township. After applying for the position in the water department, plaintiff had an interview with Yount. Yount explained the nature of the work and that there would be overtime due to emergencies. Plaintiff

was hired by Yount and went to work on or about August 25, 1985. At that time, plaintiff was the only full-time employee in the department. In addition, a green-thumb worker and general-assistance worker were utilized. Plaintiff described general-assistance workers as persons receiving Township aid who were required to work 40 hours per month.

When Yount described the duties the job entailed during the interview, he explained about repairing and maintaining equipment at the water plant; maintenance on water mains; filling work orders from customer complaints; reading, repairing, and installing meters; and attaching water lines to mains for new customers. Yount told plaintiff someone with plaintiff's mechanical ability and skill was needed.

After he was employed, plaintiff was asked to perform additional duties. He supervised the general-assistance worker and cleaned out the water tower. He flushed hydrants and dealt with customers concerning their water bills or leaks. He helped repair the rust and repaint the ceiling in the water plant. He prepared pumps used to add chemicals to the water. He also read the meters of the raw water and finished water, measured and added chemicals, tested the water, and took samples.

The general-assistance workers were used for mowing, cleaning the lime pit, repairing and painting the ceiling, and sometimes reading meters. Plaintiff described the lime pit and how they shoveled out the lime. He also described how he climbed the water tower with Wooters to clean the tank. Wooters did not enter the tank.

When plaintiff finished the job of cleaning the water tower, he described what he observed to Yount, his immediate supervisor. Some of the bars across the fill tube, where water entered the tank, were missing. Bolts holding the ladder providing access to the tank were rusty and needed replacing. Plaintiff described what he understood to be a "cathartic process system" in the tank, which was supposed to attract the rust in the tank to rods to prevent damage to the tank itself. According to plaintiff, "a lot of rods were no longer connected." Three of the eight lids on top of the tank were missing, exposing the inside of the tank. The rust screen on top of the tower was damaged, and the lock on the access hatch had to be cut to facilitate entry and so a new one was needed. He also found "considerable" rust and pitting in the tank.

Plaintiff informed Yount of those findings as soon as he climbed down from the tower. He also addressed the board of trustees meeting, attended by all the board members, on the May 13, 1986. At the

meeting, plaintiff described the condition of the tower, and Yount suggested the board of trustees put in a future budget an item for sandblasting and painting the tower. The only comment plaintiff recalls any board member making was Robertson stating plaintiff's findings were what they expected considering the age of the tank and that it had not been cleaned.

According to plaintiff, the condition of the tower was such that birds and insects could enter and contaminate the water. In addition, the tower was accessible from the ground so that people could get up there and contaminate the water. People had been up there because there was graffiti on the tank.

Plaintiff also talked to board members concerning Yount. He talked to Johnson in the spring of 1986. He advised Johnson that Yount would get angry at work and throw things. Plaintiff felt Yount was abusing the tools. According to plaintiff, Yount would also drive the truck too fast, driving 75 miles per hour on country roads and 45 miles per hour past a school when children were getting out. Plaintiff also stated he did not think it was proper for Yount to be taking the truck out of the water district at night. Plaintiff did not hear any more from Johnson about these matters.

On May 15, 1986, plaintiff also had a conversation with Robertson. At that time, plaintiff was at the town hall reviewing records he requested under the Freedom of Information Act. Plaintiff told Robertson how Yount was abusing the tools and driving the truck. Plaintiff described Yount's driving as he had to Johnson and advised Robertson that on one occasion, while plaintiff was a passenger and Yount was driving, the truck hit a bump with such force that plaintiff hit his head on the ceiling of the cab. He also told Robertson it was costing the Township $30 per week just for Yount to drive the truck home at night since Yount lived on the other side of Decatur. Robertson did not appear too concerned. Plaintiff also talked to board members Barb Banfield, Dale Workman, and Danny Rutherford at their homes about these subjects.

Plaintiff also spoke to the board of trustees at the meeting in June 1986. At that time, he made a presentation from the records he requested concerning the water-district finances, materials, use of outside contractors, and the number of personnel employed.

Plaintiff was fired on June 18, 1986. He accumulated 100 hours overtime by January 1, 1986, but still had not been paid for all of it at the time he was fired.

Plaintiff was then asked to describe his final week of work. On June 13, a Friday, Yount sent plaintiff home after telling him he al-

ready had enough hours for that week. When plaintiff came to work Monday, Yount told him to fill the lime machines, claim one hour's pay, and go home. Plaintiff checked in at 8 a.m. After filling the lime machine, he checked out at 8:30 a.m. On Thursday, Yount informed plaintiff he would be working from 8 a.m. to 10 a.m. and 2:30 p.m. to 4:30 p.m. When plaintiff asked if this was some sort of disciplinary action, Yount told him no, that plaintiff would just be working the jobs on which he was needed. Yount informed plaintiff he would be cleaning out the basement in the morning and cleaning out the lime pits, alone, in the afternoon. Plaintiff did the assigned work and worked the hours as directed. On Wednesday, June 18, 1986, plaintiff reported to work at 8 a.m., pursuant to Yount's directions. Since plaintiff had been working at the lime pits on Tuesday afternoon, that is where plaintiff went to begin working on Wednesday morning. Even with a crew of general-assistance workers, Yount, and plaintiff, it took 1 to 1½ days to clean the lime pits. On June 18, plaintiff was there alone when Yount came out at 8:22 a.m., told plaintiff to put down his shovel and get out of the pit. When plaintiff climbed out of the pit, Yount handed him a list of days plaintiff had been off and started to tell plaintiff what Johnson told Yount. However, plaintiff interrupted Yount's explanation and stated that if this was a termination or pretermination meeting, plaintiff wanted a representative present. Yount responded, "You don't have any rights. And your employment is terminated." When plaintiff inquired as to the grounds for termination, Yount informed plaintiff he did not need any. In the parking lot, as plaintiff was leaving, Yount stated to plaintiff, "You have got a lot to learn about society. That is the reason you don't have a job and I make twenty-three thousand dollars a year."

Yount never reprimanded plaintiff regarding his job performance. Plaintiff did forget to clean a valve one morning around the first of the year, but plaintiff found it and informed Yount so not much was said about it. Plaintiff was never suspended. Yount talked to plaintiff about his job performance quite a few times during the last few months plaintiff was working there. Yount told plaintiff he was doing a good job and they were accomplishing a lot at the plant. No board member ever complained to plaintiff about his job performance.

Plaintiff concluded his direct examination by describing his salary and benefits and discussing facts relevant to damages. On cross-examination, plaintiff explained his starting salary was $6 per hour and that he was promised raises for doing a good job and showing incentive. The Township wanted him to go to school and obtain a water operator's license. For each of the four licenses obtained he would

get a $1,000 raise. Yount explained that in order to get a license, plaintiff would take a class at the junior college. At the end of the semester there would be a test and, if plaintiff passed, he would get a license. The Township was going to pay the tuition, and plaintiff was offered the use of the Township truck to attend classes. Plaintiff never obtained a license.

Plaintiff first discussed a raise with Yount about the end of December 1985, or the first of January 1986. At that time, no figure was mentioned. Plaintiff did not know when raises were going to be determined or how the board of trustees operates under the budget. Yount said he thought plaintiff was worth more money. After two weeks, plaintiff asked Yount about it again. Yount said he had not yet discussed it with Johnson, but plaintiff could do so if he wanted.

Plaintiff talked to Johnson about it. Johnson explained he had just taken office in May and he would have to check on the procedure. Sometime around April 1986, Yount told plaintiff he was going to get a 6% raise. Until that time, there had been a few stress-related problems caused by plaintiff and Yount putting in a lot of time trying to accomplish a great deal in a short amount of time. Plaintiff told Yount he thought the raise was too little and that he (plaintiff) was being treated unfairly. Plaintiff felt he had been doing a good job, getting more customers, putting in new taps, cleaning the plant and water tower, and plaintiff wanted more money. Part of plaintiff's presentation to the board of trustees in June, based on the information obtained under the Freedom of Information Act, was an attempt by plaintiff to show he was worth more money.

With regard to plaintiff's conversation with Robertson in which he described Yount's use of the truck, plaintiff admitted Robertson explained that Yount was the superintendent and was on 24-hour call. Plaintiff also admitted he told Robertson that it is just costing the department money and if the Township could not afford to give plaintiff a raise, then it could not afford to allow Yount to drive back and forth to work in the truck.

Plaintiff explained he was on 24-hour call also, lived closer to the plant, and responded to most of the calls after hours and on weekends. If Yount had the truck, the tools were not available to plaintiff. Plaintiff admitted Yount was the superintendent of the water district, had a license which plaintiff did not have, and was on salary. He also admitted Yount got a 6% raise that year.

As far as cleaning out the water tower, plaintiff and Yount discussed it and Yount indicated it was going to cost the township quite a bit of money. Plaintiff was trying to impress his superiors with the

fact there was no assignment he could not handle and, therefore, volunteered to try to clean the tower even though he had not worked at heights over 30 feet before. At the time he went up there, he and Yount both knew it needed cleaning and had not been cleaned for a long time. Yount asked plaintiff to describe what he saw at the next board of trustees meeting because Yount had not seen it. Yount asked plaintiff to tell the board of trustees so it could make plans to take care of the problems plaintiff observed. Plaintiff was aware the budget had already been passed, but he was told the budget could be amended. At this time, he was also in the process of conducting his research on the past spending habits of the board of trustees. Plaintiff had requested the records before the meeting and anticipated getting them before the May meeting in order to make a presentation, but the request was not granted until after the May meeting. As a result, the plaintiff was invited back to make a presentation in June. Plaintiff admitted he talked to Johnson about a bonus for cleaning the water tower. At the May meeting, the board members did not appear surprised at what Yount told them. Nor did they appear angry about what plaintiff was telling them. No one ever told plaintiff he was being fired because of what he said about the water tower.

In June, the board of trustees told plaintiff he would not get another raise. If he wanted more money, he could go back to school and get a license. It was after his request for a raise was denied that he went to talk to some board members at their homes. Plaintiff explained he did so because his relationship with Yount was deteriorating rapidly, and he felt the situation had to be defused. He told them Yount was driving too fast and that he was afraid he would be fired. On June 12, he told Banfield, Johnson, and Yount he was looking for another job.

After being cross-examined about the completion of time cards for the weeks of May 31, June 7, and June 14, 1986, during which plaintiff explained his entries, plaintiff stated that the only explanation Yount ever gave him for firing him was that he had a lot to learn about society. It was only when plaintiff was filing for unemployment benefits that plaintiff was told he was fired for filing false time cards. Plaintiff was told this by the claims adjustor who had had a telephone conversation with Yount.

On redirect examination, plaintiff explained he had enrolled in enough courses for the fall semester of 1985 to complete his degree. However, after starting to work for the Township, plaintiff dropped these courses, intending to work on them later. He also began at-

tending the course to obtain his license, but he discontinued that because of the overtime he was working and he felt that was more important than obtaining the license at that time. Yount had a license, and they only needed one person with a license at the plant. He did try to take the license class the following semester, but the class was cancelled for insufficient enrollment.

Plaintiff also testified it was Yount who told him the budget could be amended. And after telling Yount on June 12, 1986, that he thought he might be fired, plaintiff was told by Yount that his job was not in danger and they still thought he was doing a good job. Nevertheless, it was the next day that plaintiff was sent home after showing up for work.

Plaintiff stated Yount was aware plaintiff injured his finger on May 29 and was also informed plaintiff was going to the doctor on May 30. Plaintiff testified on cross-examination that on May 30, 1986, after reporting to work, plaintiff went to the doctor to have his finger X-rayed and then returned to work. The Township did not dock any of his checks because he had accumulated overtime. He also had sick time coming. Plaintiff also explained on cross-examination that he worked over the weekend of June 6, 7, 8 because the furnace at the plant did not "kick on" automatically and had to be operated manually. The time for that weekend was entered onto two time cards for the weeks of June 7 and 14. Neither Yount nor anyone else ever told plaintiff he thought he falsified his time card.

At the close of the plaintiff's case, the defendants made a motion for a directed verdict, which the trial court granted. Considering the evidence and the reasonable inferences therefrom, the trial court ruled there was no evidence of a clearly mandated public policy being violated, nor was plaintiff discharged in violation of this rights guaranteed by the United States Constitution and protected by section 1983.

■ The trial court correctly directed a verdict. All the evidence points to problems caused by plaintiff after he realized his raise was not as substantial as he would have liked. He went over the superintendent's head to complain to the board of trustees, in private conversations about the superintendent. He also admitted there was a deterioration in the relationship between himself and Yount. The evidence does not establish plaintiff was fired for complaining about IEPA violations, and in fact none were shown to exist. The evidence does not establish that plaintiff was fired for complaining about Yount's misuse of the truck and the equipment of the department. Plaintiff testified Yount abused the tools, and took the truck home at

night. But those complaints were made after plaintiff became dissatisfied with his raise. Furthermore, the superintendent's use of the truck was explained and authorized by the board of trustees. And plaintiff's statement to Robertson that, if the Township cannot give plaintiff a raise, then the Township cannot afford to allow Yount to use the truck, clearly evidences that plaintiff's motivation stems from a private, not a public, concern. Therefore, not only were plaintiff's rights not proved to be violated by his discharge, but plaintiff has failed to establish a clearly mandated public policy which would protect his activities and give rise to a cause of action for retaliatory discharge.

Reserved for consideration is how the facts decided in the trial impact the issues raised concerning the striking of the complaint. With regard to the allegations concerning statements about finances and operations of the water department, some evidence was presented. There was also evidence of the condition of the water tower and the issue of IEPA violations as a basis for the 1983 action that did go to trial, although that basis was stricken from the retaliatory discharge action. Implicit in defendants' harmless error argument is the contention that plaintiff could not again try the question of whether his employment was inappropriately terminated because the trial conclusively determined the fact that termination of employment was done for a reason unrelated to any of the reasons alleged by plaintiff. (See, *e.g., Osborne v. Kelly* (1991), 207 Ill. App. 3d 488, 565 N.E.2d 1340.) However, the question of collateral estoppel was not argued to this court or before the trial court, and the trial court should first be allowed to consider any such argument on remand.

For the foregoing reasons, the judgment of the circuit court of Macon County is affirmed in part, reversed in part, and remanded for further proceedings.

Affirmed in part; reversed in part and remanded.

LUND, P.J., and McCULLOUGH, J., concur.