STEPHEN A. SMITH, d/b/a A B C Sanitary Hauling, *et al.*, Plaintiffs-Appellees, v. INTERGOVERNMENTAL SOLID WASTE DISPOSAL ASSOCIATION, Defendant (X L Disposal Corporation, Defendant-Appellant).—STEPHEN A. SMITH, d/b/a A B C Sanitary Hauling, *et al.*, Plaintiffs-Appellees, v. INTERGOVERNMENTAL SOLID WASTE DISPOSAL ASSOCIATION *et al.*, Defendants-Appellees.

Fourth District   Nos. 4—92—0164, 4—92—0202 cons.

Opinion filed December 23, 1992.

124

Jeffrey W. Tock, of Tock & Miller, Ltd., of Champaign, for appellee Intergovernmental Solid Waste Disposal Association.

W. Robert Blair, of Chicago, and Jeffrey W. Tock, of Tock & Miller, Ltd., of Champaign, for X L Disposal Corporation.

Glenn A. Stanko, of Reno, O'Byrne & Kepley, P.C., of Champaign, for Stephen A. Smith, John Appl, Lawrence W. Boller II, Charles H. Miller, Chris Johnson, Eddie L. Cook, Sr., Don Cory, Ronald E. Hayden, Gordon Ficklin, Chris Yager, George McLaughlin, Cheryl Manuel, Ronald W. Manuel, Russell Shaffer, William C. Uden, and Willis Sanitary Hauling, Inc.

JUSTICE McCULLOUGH delivered the opinion of the court:

On September 3, 1991, a number of garbage haulers in Champaign County, Stephen A. Smith, d/b/a A B C Sanitary Hauling; John Appl, d/b/a Appl Sanitary Service; Lawrence W. Boller II, d/b/a Area Garbage Service; Charles H. Miller, d/b/a C.H. Miller Sanitary; Chris Johnson, d/b/a Chris's Service Company; Eddie L. Cook, Sr., d/b/a Cook's Sanitary Hauling; Don Cory, d/b/a Cory Sanitary Hauling; Ronald E. Hayden, d/b/a Hayden Sanitary Service; Gordon Ficklin, d/b/a Illini Sanitary Service; Chris Yager, d/b/a Klean-Way Disposal; George McLaughlin, d/b/a McLaughlin Sanitary; Cheryl Manuel, d/b/a Rollaway Waste; Ronald W. Manuel, d/b/a Ron Manuel Sanitary; Russell Shaffer, d/b/a Shaffer Sanitary Company; William C. Uden, d/b/a Uden & Sons Sanitary Hauling; and Willis Sanitary Hauling, Inc., filed a complaint for declaratory and injunctive relief against defendants, Intergovernmental Solid Waste Disposal Association (ISWDA), and X L Disposal Corporation (XL), in the circuit court of Champaign County concerning a contract to design, construct, and operate a material recovery and transfer facility (MRF) between defendants. Plaintiffs alleged the contract was entered into without competitive bidding in violation of section 5—1022 of the Counties Code (Ill. Rev. Stat. 1989, ch. 34, par. 5—1022). As relief, plaintiffs sought a declaration that the contract violated the statute, and is therefore void, and an injunction against performance of the contract by defendants. After defendants filed their answers to plaintiffs' complaint, plaintiffs filed a motion for judgment on the pleadings. Defendant thereafter filed an affirmative defense of *laches*; a motion for

summary judgment alleging *laches*, compliance with the statute, and inapplicability of the competitive bidding requirements to the present contract; and a motion to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—615).

After considering the documents filed and arguments of counsel, on January 28, 1992, the trial judge issued a memorandum of decision and order. Finding that *laches* did not bar plaintiffs' suit, the affirmative defense of *laches* was "stricken." While agreeing that there was no genuine issue of material fact as defendants' motion for summary judgment maintained, the trial judge decided a ruling in defendants' favor could not be maintained as a matter of law, denied defendants' motions for summary judgment and dismissal, and granted plaintiffs' motion for judgment on the pleadings.

On February 5, 1992, defendants filed a motion for clarification which was considered and ruled upon on February 10, 1992. Defendants filed a notice of appeal on February 25, 1992, docketed case No. 4—92—0164.

On February 20, 1992, plaintiffs had filed a petition for rule to show cause against defendants alleging a violation of the trial court's January 25, 1992, order by pursuing an application for site approval and refusing to withdraw the application for site approval. Plaintiffs sought an order finding defendants in contempt of court, imposing sanctions, directing defendants to withdraw the application for site approval, and enjoining defendants from seeking a developmental permit. On February 26, 1992, defendants filed a motion to strike the petition for rule to show cause, and on March 3, 1992, after hearing arguments of counsel, the motion to strike the rule to show cause was granted. On March 6, 1992, plaintiffs filed a notice of appeal from the order striking the petition for rule to show cause, docketed case No. 4—92—0202. A motion to consolidate these appeals was allowed by this court on March 20, 1992. On June 24, 1992, ISWDA's motion to be dismissed as an appellant in No. 4—92—0164 was granted.

The issues to be considered on review are: (1) whether the appeal in case No. 4—92—0164 is moot; (2) whether the trial court properly determined that the affirmative defense of *laches* did not apply to this case; (3) whether the defendants complied with the applicable competitive-bidding requirements; (4) whether ISWDA Ordinance 91—3 (Intergovernmental Solid Waste Disposal Association Ordinance No. 91—3, Nov. 13, 1991) exempted the subject facility from the competitive-bidding requirements of section 5—1022 of the Counties Code; and (5) whether the trial court erred in striking plaintiffs' peti-

tion for rule to show cause why defendants should not be held in contempt of court for violation of a court order. We affirm.

■ Before analyzing the issues raised on review, we must first consider a motion by plaintiffs to strike a portion of XL's reply brief in case No. 4—92—0164 and XL's objections thereto. Plaintiffs argue the objectionable portion of the reply brief raised for the first time the contention that the subject contract falls within the professional services exception of the competitive-bid statute, relying on this court's decision in *Charlton v. Champaign Park District* (1982), 110 Ill. App. 3d 554, 442 N.E.2d 915, and two out-of-State cases.

In *Darnall v. City of Monticello* (1988), 168 Ill. App. 3d 552, 553, 522 N.E.2d 837, 838, this court stated:

"The theory upon which a case is tried in the lower court cannot be changed on review and an issue not presented to or considered by the trial court cannot be raised for the first time on review. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575, 577; *Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 25, 473 N.E.2d 588, 594.)"

Furthermore, points not presented in appellant's initial brief may not be raised in the reply brief. (*In re Liquidations of Reserve Insurance Co.* (1988), 122 Ill. 2d 555, 568, 524 N.E.2d 538, 544; 134 Ill. 2d R. 341(e)(7).) Relying on *Hux v. Raben* (1967), 38 Ill. 2d 223, 224-25, 230 N.E.2d 831, 832, XL argues that as a matter of discretion, this court may consider the contention relating to the professional services exception. Although the motion to strike is denied as overbroad because it requests the striking of pages 6 through 12 of XL's reply brief entirely, this court declines to consider XL's belatedly raised contention concerning the professional services exception to the subject competitive-bidding statute, having deemed that contention waived for purposes of review.

The ISWDA is a municipal joint action agency created on July 22, 1984, by the cities of Champaign and Urbana and the County of Champaign under section 3.2 of the Intergovernmental Cooperation Act (Act) to deal with solid waste issues transgressing municipal boundaries within Champaign County. (Ill. Rev. Stat. 1989, ch. 127, par. 743.2.) The Act requires all expenditures made by ISWDA be in accordance with the law applicable to the ISWDA member with the largest population. (Ill. Rev. Stat. 1989, ch. 127, par. 743.5.) Champaign County is the entity with the largest population of the three entities which signed the agreement. Thus, section 5—1022 of the Counties Code is the applicable law and regulates large purchases of the type at issue here. Section 5—1022 states as follows:

"Any purchase by a county with fewer than 2,000,000 inhabitants of services, materials, equipment or supplies in excess of $10,000, other than professional services, shall be contracted for in one of the following ways:

(1) by a contract let to the lowest responsible bidder after advertising for bids in a newspaper published within the county or, if no newspaper is published within the county, then a newspaper having general circulation within the county; or

(2) by a contract let without advertising for bids in the case of an emergency if authorized by the county board.

In determining the lowest responsible bidder, the county board shall take into consideration the qualities of the articles supplied, their conformity with the specifications, their suitability to the requirements of the county and the delivery terms.

*This Section does not apply to* contracts by a county with the federal government or to purchases of used equipment, purchases at auction or *similar transactions which by their very nature are not suitable to competitive bids,* pursuant to an ordinance adopted by the county board." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 34, par. 5—1022.

The ISWDA wished to contract with a party to design, construct, and operate an MRF. It began the process by issuing on July 21, 1989, a "Request for Qualifications" (RFQ). A notice of the RFQ, published in the Champaign-Urbana News-Gazette on July 26, 30, and August 6, 1989, stated the ISWDA was using the RFQ to compile a list of qualified vendors which would then submit "proposals" for the development of the MRF. The notice stated, "The ISWDA is intending to use a full-service procurement process. The proposed facility is to be publicly financed and owned while contracting with a vendor for the design/development of the facility with a separate contract for operation and landfill disposal." The notice described the proposed facility as receiving 100,000 tons of mixed solid waste per year and 10,000 tons per year of source-separated material. The notice further stated that "it is the intent of the ISWDA to use this RFQ to prequalify vendors to receive the Request for Proposal for the Material Recovery/Transfer Facility. Only vendors responding to this RFQ and determined qualified will be permitted to submit proposals for the facility."

On September 20, 1989, ISWDA selected 11 firms which would be permitted to respond to the "Request for Proposal" (RFP). The RFP is a 186-page document soliciting proposals from firms for the design, construction, and operation of the MRF.

Section 1.1 of the RFP announced "the ISWDA intends to use the proposals to determine a Contractor who would subsequently enter into contract negotiations." The RFP stated the proposal shall include the "design, construction and operation of the facility for a minimum of five years, although longer contract periods are desired." Further, the RFP stated the minimum period for disposal services is three years. The RFP encouraged alternate bids for facilities at other sites, for longer operating periods, facilities with greater levels of recovery, and other characteristics. The site for this facility was not determined in the RFP, although some potential sites were identified. Bidders were notified that they were not precluded from securing sites they would prefer more.

Section 3.1 of the RFP stated the ISWDA:

"will enter into a Contract with the selected Contractor for the design, construction, start-up, acceptance testing, and operation of the Facility. This section outlines certain terms of the contract. The information provided in this section is not intended to be all-encompassing. The ISWDA reserves the right to modify the provisions contained in this RFP and to add additional provisions. However, the ISWDA believes that providing this information in this RFP will assist respondents in preparing their proposals and enhance the negotiation process."

Section 3.7 of the RFP, entitled "Performance Criteria," encompassed a number of subsections. Section 3.7.2 required the contractor to pass an acceptance test for the MRF, which would test its ability to recover materials. However, the types of materials to be recovered were not specified, but would be "based on each Contractor's proposal and as agreed upon by the ISWDA and the Contractor." Further, the RFP did not specify what guaranteed material recovery efficiencies were required, leaving that to the contractor to decide. The acceptance test protocol was to be agreed upon by the ISWDA and the contractor before testing and based on performance guarantees proposed by the contractor and negotiated into the agreement. Section 3.7.3 required the contractor to meet or exceed established performance guarantees, or pay liquidated damages, but "the number and type of performance guarantees required by the ISWDA will be subject to the terms and conditions of the Contract." The contractor was required to provide minimum performance guarantees, such as the number of days the construction period would last, the tons per year of mixed waste and materials processed, and an annual material recovery guarantee, but the RFP included no specifications on these guarantees.

Section 4 of the RFP described the "minimum technical requirements for the design, construction and operation of the Facility." However, these minimum technical requirements expressly were not "intended in any way to be all inclusive or limit margins of conservatism or special features which the Contractor may wish to apply." The contractors were warned, "The requirements are subject to change in the Service Agreement between ISWDA and the Contractor. The Service Agreement and other executed documents alone will determine the ultimate rights and obligations of the contracting parties." Section 4.2.1 required the MRF should be designed, constructed, and operated in accordance with good engineering practice. Section 4.2.2 required that the equipment used must be new, and of a "heavy-duty construction." Section 4.2.3 required that the minimum life of the MRF was required to be 25 years. Section 4.2.4 adopted the standards for material, construction, and equipment of a number of trade associations and government agencies. Section 4.3 provided a table of estimated waste composition in Champaign County, but the information was for proposal purposes only, and not meant to guarantee the waste composition would be of that quality. This section further provided the facility should be designed with a capacity to receive a minimum of 350 tons per day of mixed waste and 35 tons per day of source-separated materials. The MRF should have the minimum capacity to store 700 tons of mixed waste at a specified maximum floor density. Section 4.7.4 specified the different source-separated materials which the MRF must process and store, and section 4.14.5 described specific wastes that would be excluded from the MRF, including special waste, landscape waste, and hazardous hospital wastes.

Under section 5.2.1 of the RFP, contractors were required to post a proposal bond equal to 2% of the value of the proposal. This bond would be returned to contractors which were not selected upon the signing of a contract with the selected contractor. Further, this section stated, "Failure of the selected Contractor to enter into Contract with the ISWDA on or before September 1, 1990[,] because of nonresponsive negotiations or failure of the selected Contractor to exercise good faith in arriving at a formal agreement shall constitute cause for the ISWDA to retain the proposal bond as liquidated damages." Although the RFP stated in section 5.2.4 that "Permission will not be given for the withdrawal or modification of any Proposal after submission to the ISWDA," it later reserved the right to request further information from the contractors in order to evaluate the proposals in section 5.2.7.

Section 6 of the RFP described evaluation and selection consider-ations. In section 6.1 it was stated that "If for any reason during the course of negotiations with the Contractor, the ISWDA determines that a reasonable contract cannot be negotiated, the ISWDA reserves the right to suspend negotiations with the Contractor, contact the sec-ond ranked Contractor and begin negotiations for the purpose of sign-ing a Service Contract with that Contractor." Some contractors would be asked to attend personal interviews to discuss their proposals. Sec-tion 6.2.6 permitted the contractor to vary the bid from the require-ments of the RFP, stating that in this situation, a contractor must de-tail and specify "exceptions." These exceptions, "to the extent that they are material and substantive, will be important elements in the evaluation."

ISWDA received proposals from three potential contractors as fol-lows: XL ($5,925,500), Seres/Community Recycling Centers (Seres/CRC) ($13,998,308), and Peoria Disposal Corporation/National Re-source Republic System (PDC/NRRS) ($16,320,000). The proposal of PDC/NRRS was judged to be nonresponsive to the terms of the RFP since it did not provide for commercial operation of the facility and did not accept the business conditions of the RFP. The proposals of XL and Seres/CRC were adjusted by the ISWDA. After adjustment, the proposal of XL was $7,445,087 and that of Seres/CRC was $13,148,308. After XL was selected as the lowest responsible bidder, the contract price was further adjusted to $7,410,087.

ISWDA and XL then entered into contract negotiations, and ulti-mately executed a contract on April 30, 1991. The trial court found that the plaintiffs' complaint pointed out a number of variations be-tween the requirements in the RFP, XL's bid, and XL's obligations under the contract, which the trial court's memorandum summarized as follows:

"(1) the RFP required 20% of the waste stream be recycled; the contract requires 15%;

(2) the RFP prohibits the contractor from participating in any phase of collecting, processing, or disposing of solid waste in the county; the contract does not prohibit this, and instead permits such activity on ISWDA approval;

(3) the RFP required the contractor to pay $6,000 per hour liquidated damages for each hour the MRF reached maximum capacity and therefore could not [be] used; the contract does not include this provision;

(4) the RFP required facilities for accepting and processing certain source-separated materials; the contract does not obli-

gate XL to accept and process the same materials, batteries and motor oil being excluded;

(5) the RFP required that the contractor provide a rotating head forklift to service municipal collection vehicles; the contract does not require this;

(6) the RFP requires a traffic study; the contract does not.

Finally, the price in the executed contract is $1.48 million more than the price XL offered in its bid that was selected over the other two proposals submitted."

In the trial court, defendants argued that ISWDA ordinance No. 91—3, enacted November 3, 1991, exempted the MRF from the statutory competitive-bidding requirements. (Intergovernmental Solid Waste Disposal Association Ordinance No. 91—3, Nov. 13, 1991.) With regard to the ordinance, the trial court ruled that if the MRF was suitable to the competitive-bidding process and compliance with the statute was not had, ISWDA ordinance No. 91—3 could not cure the defect.

In striking the affirmative defense of *laches*, the trial court reasoned that plaintiffs did not have the opportunity to sue until the contract was executed. Until then, an injury was speculative, and no factual issues were raised because plaintiffs' knowledge of the proposed terms was irrelevant.

Determining that the competitive-bidding statute was violated in this case, the trial court pointed to the absence of specifications. The trial court recognized some of the provisions in the RFP were sufficiently specific. The court also noted that some provisions in the RFP were based on proposals from the contractor with further agreement between the parties being required. Many of the specifics of the project were subject to such negotiability. Furthermore, the bids did not conform to the requirements of the invitation to bid, and the negotiability of the contract improperly allowed the contractor to modify the bid after the bid was submitted. The trial court's reasoning was as follows:

"A continuing thread through defendants' argument is that the MRF is a rather unique structure and that may be so, but there is nothing to show that it was unsuitable for the competitive bidding process. As has been stated, the contrary is apparent. The MRF is truly an enormously costly undertaking and it should not have been exempted from the competitive bidding process unless it was truly unworkable to do otherwise. It was not impossible for the ISWDA to be competently advised in advance as to such matters as performance goals and standards

so it did not have to throw the process open to permit bidders to negotiate these and then, once that foot was in the door, open the process further to permit more negotiation so that the entire process became one with the potential to invite all of those things which the competitive bidding process is designed to prevent.

The Court rules that the process the ISWDA employed resulting in the contract with XL violated the statutorily imposed competitive bidding requirements because 1) the RFP did not contain sufficient specificity to permit vendors to know what to design to agree to build; instead the RFP contained few performance requirements and permitted vendors in some significant ways to set their own performance standards; 2) there were significant variances between what the RFP required of proposals and what the selected contractor as [sic] actually had to deliver under the contract; and 3) the ISWDA failed to require binding bids and instead negotiated with XL over the contract permitting XL to raise the contract price nearly $1.5 million after the bids had been submitted."

The first issue to consider is whether the appeal in No. 4—92—0164 is moot. Plaintiffs argue the appeal has become moot because ISWDA has withdrawn as a party to it. Plaintiffs raise this argument even though this court has already denied a motion to dismiss for mootness. Rulings on motions to dismiss on appeal are not unassailable, and reconsideration of the denial of the motion may be had. *People v. Nichols* (1986), 143 Ill. App. 3d 673, 676, 493 N.E.2d 677, 679.

■ In the motion to dismiss the appeal, plaintiffs relied on the fact that the contract between ISWDA and XL could be terminated if ISWDA determined that such termination of the contract was in its best interests. Attached to the motion to dismiss the appeal was a copy of the minutes of the ISWDA special board meeting of June 3, 1992. Although the ISWDA did elect to continue the appeal before the Pollution Control Board for MRF site approval, the board also voted to withdraw and discontinue litigation regarding the ISWDA-XL contract procurement procedures and "to notify XL of the termination of the contract pursuant to Section 6.20 of the contract in the event the contract is reinstated on appeal." In its objections to the motion to dismiss, XL argues that section 6.20(c) of the contract provides for recovery of its costs, plus 5% thereof, if ISWDA terminates the contract. According to XL, in order to be entitled to this contractual right, XL must be successful on appeal. Defendant XL also points

out that the contract between the ISWDA and XL could be revitalized by a similar vote of the ISWDA board.

In *La Salle National Bank v. City of Chicago* (1954), 3 Ill. 2d 375, 378-79, 121 N.E.2d 486, 488, the Illinois Supreme Court discussed that a case is moot if it does not involve any actual controversy, and the reviewing courts will not consider a case merely to decide moot or abstract questions, establish a precedent, determine the right to, or the liability for, costs, or render a judgment to guide potential future litigation. In light of the impact a determination of this appeal will have on the rights of XL under the contract, we deem the issues on appeal in this case are not moot.

The next issue is whether the trial court properly determined that the affirmative defense of *laches* did not apply to this case. In order to determine the proper standard of review for this issue, an understanding must be reached regarding the stage of the pleading process that was involved and precisely what the trial court decided. The answers of the defendants did not include the affirmative defense of *laches*. After plaintiffs filed the motion for judgment on the pleadings, defendants jointly moved to file the affirmative defense, in effect seeking to amend their answers pursuant to section 2—616(a) of the Code (Ill. Rev. Stat. 1989, ch. 110, par. 2—616(a)). That motion was allowed over plaintiffs' objections on December 2, 1991. Subsequently, plaintiffs moved to strike the affirmative defense. The question which must be considered is whether the trial judge granted the motion to strike as part of the final order of the trial court or decided on the merits that the defense of *laches* did not apply to this case.

XL suggests the standard of review is whether the trial court committed an abuse of discretion, and plaintiffs concede that is the standard of review. Both parties cite *Ruddock v. First National Bank* (1990), 201 Ill. App. 3d 907, 559 N.E.2d 483. It is true that in *Ruddock* an abuse of discretion standard of review applied to a refusal of the trial court to apply the doctrine of *laches* following a bench trial. (*Ruddock*, 201 Ill. App. 3d at 910, 918, 559 N.E.2d at 484, 489-90.) In order for this standard of review to apply, the trial court in this case must have determined, on the merits, that the defense of *laches* did not apply to this case. Had the trial court granted plaintiffs' motion to strike the affirmative defense, the standard of review would be different, and the issue could be reviewed as a question of law. See *Betts v. Manville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 929, 588 N.E.2d 1193, 1223; *Zientara v. Long Creek Township* (1991), 211 Ill. App. 3d 226, 235, 569 N.E.2d 1299, 1303.

■ In the memorandum of decision, the trial court discussed the affirmative defense of *laches* and its application to the facts of the case at length. Although the trial court did conclude the discussion by ruling that the "defense of laches is stricken," we deem this formalistic language to be surplusage and find that the trial court decided the defense of *laches* was not applicable to the facts of this case on the merits as part of denying the motion for summary judgment, and did not grant plaintiffs' motion to strike the affirmative defense. Therefore, this court will not overturn the trial court's ruling as to *laches* unless that ruling resulted from an abuse of discretion.

The instant action was one for declaratory judgment and injunctive relief. An action to seek an injunction is an action in equity. The equitable doctrine of *laches* is available as a defense in equitable proceedings if the proper circumstances exist. (See *Elliott v. Pure Oil Co.* (1956), 10 Ill. 2d 146, 156, 139 N.E.2d 295, 301.) *Laches* is also available as a defense to declaratory judgment actions. *Villiger v. City of Henry* (1977), 47 Ill. App. 3d 565, 567, 362 N.E.2d 120, 121; *Cangelosi v. Board of Fire & Police Commissioners* (1973), 12 Ill. App. 3d 799, 800, 299 N.E.2d 151, 152.

> "What facts will combine to constitute *laches* is to be determined in the light of the circumstances of each case; however, it is pointed out in 19 Am. Jur., Equity, sec. 498, that a suit is held to be barred on the ground of *laches* or stale demand 'where and only where' the following facts are disclosed: (1) Conduct on the part of the defendant giving rise to the situation of which complaint is made and for which the complainant seeks a remedy; (2) delay in asserting the complainant's rights, the complainant having had notice or knowledge of defendant's conduct and the opportunity to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit, and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is held not to be barred."
> *Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 553, 147 N.E.2d 341, 344.

XL attempts to demonstrate that the plaintiffs could have filed an action as early as July 1989 and certainly by the spring of 1990. The action was filed on September 3, 1991. Plaintiffs argue they were not injured until the contract was entered into between ISWDA and XL on April 30, 1991. Plaintiffs' complaint alleged that the contract would require them to pay tip fees greater than they are currently paying and the amount of the tip fee was directly proportional to the costs of constructing the MRF and to the monthly service fee paid to

XL, which included the management fee paid to XL and various operations and maintenance costs which XL was entitled to pass through to ISWDA under the contract, resulting in a significant and detrimental economic impact to plaintiffs. Defendant argues that, through a series of newspaper articles, plaintiffs should have been aware of the potential for this type of impact at an early stage.

Even if it is arguable that plaintiffs knew of the procedure of which they now complain at an earlier date and even assuming that XL expended time and money which it would not have expended had plaintiffs challenged the competitive-bidding process earlier, XL has failed to explain how plaintiffs would actually *know* they were going to be injured by this process until the ISWDA decided which bid would be accepted. The ISWDA could have rejected all bids as inadequate or unresponsive. And while taxpayers in general may have challenged the bidding process earlier, plaintiffs sought to right injuries unique to them. XL does not allege plaintiffs were bidders or potential contractors or persons to whom an RFP was sent. Of course, injunctive relief could be granted to prevent a threatened injury, but the party still has to convince the court there is potential for a real, rather than an imagined, injury. It would not be appropriate to encourage suits in anticipation of injuries. The fact that plaintiffs plead the date of issuance of the RFP, February 1, 1990, and can now refer to its contents in the complaint does not establish that, on the date the RFP was issued, plaintiffs received one or knew of its contents.

> "Abuse of discretion means clearly against logic. (*Daiber*, 191 Ill. App. 3d at 568, 548 N.E.2d at 19.) The question is not whether the appellate court agrees with the circuit court, but whether the circuit court acted arbitrarily, without employing conscientious judgment, or whether in view of all of the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted. *In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 326, 491 N.E.2d 894, 898." (*Washington v. Illinois Power Co.* (1990), 200 Ill. App. 3d 939, 942, 558 N.E.2d 509, 511, *rev'd on other grounds* (1991), 144 Ill. 2d 395, 581 N.E.2d 644.)

The trial court did not commit an abuse of discretion in refusing to apply the doctrine of *laches* in this case.

The next issues to be considered relate to the general question of whether the trial court properly granted plaintiffs a judgment on the pleadings. In *Mitchell v. Waddell* (1989), 189 Ill. App. 3d 179, 181-82, 544 N.E.2d 1261, 1262-63, this court explained the distinction

between summary judgment and judgments on the pleadings as follows:

"Section 2—615(e) of the Code of Civil Procedure (Code) permits a party to file a motion for judgment on the pleadings. (Ill. Rev. Stat. 1987, ch. 110, par. 2—615(e).) Although a motion for judgment on the pleadings is akin to a motion for summary judgment, since both suggest no genuine issue of material fact exists, the two motions differ in that a motion for judgment on the pleadings submits that no issue of triable fact existed and the movant is entitled to judgment under the averments and admissions of the pleadings, while a motion for summary judgment may utilize affidavits and other documents to establish the absence of a genuine issue of a material fact. (*Tompkins v. France* (1959), 21 Ill. App. 2d 227, 157 N.E.2d 799.) A motion for judgment on the pleadings asks the trial court to review the pleadings and determine, as a matter of law, that the pleadings fail to present a triable issue of fact. (*Maywood Sportservice, Inc. v. Maywood Park Trotting Association, Inc.* (1976), 40 Ill. App. 3d 1028, 353 N.E.2d 295.) All well-pleaded facts contained in the pleading of the nonmoving party, and the fair inferences therefrom, are considered admitted for the purposes of determining the motion. (*Baker-Wendell, Inc. v. Edward M. Cohon & Associates, Ltd.* (1981), 100 Ill. App. 3d 924, 427 N.E.2d 317.) ***

After the judgment on the pleadings is entered, the reviewing court must ascertain whether the trial court's determination that no genuine issue as to any material fact was presented in the pleadings was correct. If no such issues exist, then the reviewing court must determine whether judgment was properly entered. *Upper Avenue National Bank v. First Arlington National Bank* (1980), 81 Ill. App. 3d 208, 400 N.E.2d 1105."

In light of this standard of review, the next question which must be decided is "whether plaintiffs' allegation that defendants failed to comply with the applicable competitive bidding requirements is correct."

XL cites several Illinois competitive-bidding statutes in an attempt to impress this court with the fact that a great many exceptions to other competitive-bidding provisions have been legislatively created and thereby to convince this court there should be an exception in this case as well because of the uniqueness of this facility. (See Ill. Rev. Stat. 1991, ch. 24, pars. 8—9—1, 8—10—1 *et seq.*; ch. 34, par.

5—36006; ch. 42, par. 310; ch. 105, par. 8—1; ch. 122, pars. 10—20.21, 103—27.1; ch. 127, par. 132.1 *et seq.*; ch. 139, par. 160.50.) As a result of XL's argument, it becomes apparent that the MRF is not specifically exempted from section 5—1022 of the Counties Code and that, if the legislature wanted to do that, the legislature understood how to accomplish such a result.

Section 5—1022 of the Counties Code expressly does not apply to "contracts by a county with the federal government or to purchases of used equipment, purchases at auction or similar transactions which by their very nature are not suitable to competitive bids." (See Ill. Rev. Stat. 1989, ch. 34, par. 5—1022.) The question in this case is whether the MRF was one of these "similar transactions not suitable to competitive bidding."

> "In determining legislative intent, consideration must be given to the entire statute, its nature, object, and purpose to be attained, and the evil to be remedied. (*City of Springfield v. Board of Election Commissioners* (1985), 105 Ill. 2d 336, 340-41; *Mid-South Chemical Corp. v. Carpentier* (1958), 14 Ill. 2d 514, 517.) However, if the intent of the legislature can be ascertained from the language of the statute itself, then that intent will prevail without resort to extrinsic aids for construction. *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 277; *Louis A. Weiss Memorial Hospital v. Kroncke* (1957), 12 Ill. 2d 98, 105." (*Benjamin v. Cablevision Programming Investments* (1986), 114 Ill. 2d 150, 157, 499 N.E.2d 1309, 1313.)

Where the statutory language is unambiguous, the court's function is to apply the law as enacted. (*Benjamin*, 114 Ill. 2d at 164, 499 N.E.2d at 1316.) In this case, there may be some confusion as to what the word "similar" refers. In *Benjamin*, the court described the doctrine of last antecedent as follows:

> "This doctrine of statutory construction requires that modifying words or phrases be construed to modify words or phrases immediately preceding them rather than more remote words or phrases, unless the intent of the legislature disclosed by the context and reading of the entire statute requires otherwise. (*People v. Thomas* (1970), 45 Ill. 2d 68, 72.)" (*Benjamin*, 114 Ill. 2d at 167, 499 N.E.2d at 1318.)

If this doctrine is applied to the case at bar, the word "similar" refers to purchases of used equipment and purchases at auction. The instant MRF contract is not similar to such transactions.

In the absence of a statute requiring competitive bidding, competitive bidding is not necessary for a public body to enter into a

valid contract. (*People ex rel. Adamowski v. Daley* (1959), 22 Ill. App. 2d 87, 91, 159 N.E.2d 18, 20.) In addition, some contracts are not required to be competitively bid. It depends on the language of the statute involved.

In arguing that the statute does not require competitive bids in this case and that, in any event, the competitive-bidding statute was complied with, XL raises the following four contentions: (1) The RFP was sufficiently specific; (2) there was no material variance between the RFP and XL's bid; (3) the ISWDA did require a binding bid; and (4) the MRF was a unique facility not suitable to traditional competitive bidding.

The trial court in considering XL's contention determined that the RFP did not provide sufficient detail where it was possible to do so in spite of the arguable uniqueness of the MRF. Plaintiffs do not contest the fact that the facility is unique, but suggest it was suitable for competitive bidding. In addition to the cases cited in the reply brief, XL cited 10 G. O'Gradney & C. Miller, McQuillin on Municipal Corporations §§29.29, 29.53 (3d rev. ed. 1990), and the case of *E & E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 481 N.E.2d 664.

The *E & E Hauling, Inc.*, case is cited for the proposition that there is a presumption that public officials act in the best interests of their constituents. The question addressed in *E & E Hauling, Inc.*, was whether the county board should be disqualified as a decision maker on a permit application because of possible bias due to the effect on county revenue. (*E & E Hauling, Inc.*, 107 Ill. 2d at 42, 481 N.E.2d at 667-68.) The *E & E Hauling, Inc.*, case does not stand for the proposition that elected or appointed public officials can do whatever they want to do in disregard of the competitive-bidding statute.

XL also argues the trial court's notion of competitive bidding does not comport with "modern notions" of competitive bidding.

"The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable pur-

pose. Competitive bidding provisions must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way." 10 G. O'Gradney & C. Miller, McQuillin on Municipal Corporations §29.29, at 375 (3d rev. ed. 1990).

"The nature of the work required should be stated as definitely as is practicable. Under laws requiring that plans and specifications and detailed drawings be prepared, it is sometimes difficult to determine to what extent the drawings or specifications must be carried into detail. Such provisions are not to be construed literally, but in a manner merely to secure the object for which they were designed.
    ***
It is the duty of public officials, in advance of calling for bids, to adopt reasonably definite plans or specifications." (10 G. O'Gradney & C. Miller, McQuillin on Municipal Corporations §29.53, at 444 (3d rev. ed. 1990).

While the level of professional and scientific skill needed may be relevant to a general exception for transactions not suitable to competitive bidding, that is not what the language in section 5—1022 of the Counties Code provides. Had the legislature intended that result it would have so stated, and it certainly could have, as shown by the exceptions to the competitive-bidding statutes applied in *Charlton* (110 Ill. App. 3d 554, 442 N.E.2d 915), and *Waste Management, Inc. v. Wisconsin Solid Waste Recycling Authority* (1978), 84 Wis. 2d 462, 267 N.W.2d 659. The trial court correctly rejected XL's argument that the uniqueness of the facility created an exception to the competitive-bidding statute.

With regard to the specificity of the RFP and variances between the RFP and the bid, in paragraph 44 of the complaint, plaintiffs alleged as follows:

"44. The RFP included no architectural or engineering plans, drawings, or specifications. In its essence, the RFP solicited vendors to design an MRF to process and separate unspecified waste and to process and store certain source[-]separated recyclables; to submit cost estimates for the construction of the proposed facility and its various components; and to submit cost estimates for the operation of the MRF. There was no specification of the building design, the site layout, the desired equipment, or of the manner and method of the operational processes."

XL admitted these allegations.

XL argues the trial judge's ruling that the RFP did not contain sufficiently detailed specifications was not the same as the requirement of being "as detailed as practicable."

> "[T]he plans and specifications should be as detailed as practicable. If they are too detailed, however, the plans and specifications act to limit the number of potential suppliers entering bids. (10 McQuillan, Municipal Corporations sec. 29.53, at 355 (3d ed. 1981).) A proper balance must be struck between detail and generality. The plans and specifications drafted by the City of Chicago achieved this balance." (*Smith v. F.W.D. Corp.* (1982), 106 Ill. App. 3d 429, 432, 436 N.E.2d 35, 36.)

As already noted, the trial court found several sufficiently specific provisions in the RFP, but also found others that were not.

Before advertising for bids, the local governmental unit should ascertain the nature of the work to be done and the kinds, character, and quality of the material to be used. A plan or profile of the work should be prepared. The specifications contained in the profile should be so definite and of such sufficient detail as to enable anyone experienced in such matters to determine the work to be done in all details. (*M.A. Lombard & Son Co. v. Public Building Comm'n* (1981), 101 Ill. App. 3d 514, 518-19, 428 N.E.2d 889, 891.) Where a statute requires competitive bidding, compliance with the statute is mandatory, and the failure to comply renders the resultant contract invalid. (*Premier Electrical Construction Co. v. Board of Education* (1979), 70 Ill. App. 3d 866, 871, 388 N.E.2d 1088, 1092.) With regard to the specificity of the RFP, the trial court recognized the argument that the project could not be predesigned and that soliciting the bids through the RFP was the only feasible method since the technology for the mixed waste processing is new and varies, there being only four such facilities in the country and XL operating the only one in Illinois. The trial court also recognized plaintiffs' argument that the statute is violated by having firms bid on different designs, citing *Sanitary District v. Lee* (1898), 79 Ill. App. 159, wherein the trial court stated such a procedure permitted too much discretion and the sanitary district must adopt a plan or design for the bridge project before advertising for bids because the design of the bridge was material to the contract. Bidders were not permitted to bid on their own design. (*Lee,* 79 Ill. App. at 176.) *Lee* is distinguishable from this case on this very point. In that case, the project was a bridge. There is therein no discussion of the project being so unique that each contractor's design would be different of necessity.

The trial court relied on the fact that the contract between ISWDA and XL did not conform to the RFP and that the ISWDA did not seek a binding bid since much of the contract was open to negotiations. In *Leo Michuda & Son Co. v. Metropolitan Sanitary District* (1981), 97 Ill. App. 3d 340, 344, 422 N.E.2d 1078, 1082, the responsiveness of bids was discussed:

> "Bids must conform to the advertised requirements of the invitation to bid. (*King v. Alaska State Housing Authority* (Alas. 1973), 512 P.2d 887; *Application of Glen Truck Sales & Service, Inc.* (1961), 31 Misc. 2d 1027, 220 N.Y.S.2d 939; *Township of Hillside v. Sternin* (1957), 25 N.J. 317, 136 A.2d 265; *Sanitary District v. McMahon & Montgomery Co.* (1903), 110 Ill. App. 510.) Although a 'minor' variance does not require rejection of the proposal (*King* and the cases cited therein), a 'material' variance will require rejection of the proposal. (*King* and the cases cited therein.) A bid which contains a material variance is an unresponsive bid and may not be corrected after the bids have been opened in order to make it responsive[.] (*City of Chicago v. Mohr* (1905), 216 Ill. 320, 74 N.E. 1056.) The test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders. (*King; In re Application of Gottfried Baking Co.* (1964), 45 Misc. 2d 708, 257 N.Y.S.2d 833; *Application of Glen Truck Sales & Service, Inc.* (1961), 31 Misc. 2d 1027, 220 N.Y.S.2d 939.) 'Every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or disregard and thus to estimate his bid on a basis different from that afforded the other contenders.' *Hillside Township v. Sternin* (1957), 25 N.J. 317, 322-23, 136 A.2d 265, 268."

Furthermore, it is improper to allow a bid to be modified in a material fashion after opening because that gives an unfair advantage to that particular bidder. *City of Chicago v. Mohr* (1905), 216 Ill. 320, 326-28, 74 N.E. 1056, 1058; *Leo Michuda & Son*, 97 Ill. App. 3d at 344-45, 422 N.E.2d at 1082.

The trial court noted there were variances between the requirements of the RFP, XL's bid, and the contract. As to the variations, the trial court stated:

> "In the instant case, there is material variance between what the RFP required and what the contract contains. These variances were described earlier, and include the percentages of source[-]separated materials to be processed, whether the con-

tractor could participate in waste collection in the county, liquidated damages, processing and storage of motor oil and batteries, and that a traffic study must be performed. Plaintiffs argue the RFP phrased these requirements in the mandatory 'shall' but that the contract with XL either omits these requirements or materially alters them. ISWDA responds that none of the variations (which it admits exist) is material because they did not give XL an unfair advantage. Each of the variations are discussed below, along with ISWDA's argument that they are not material.

*Recovery Rate*

ISWDA claims the variation is not material because while both XL's and Seres/CRC's bids exceeded the 20% requirement, they were both adjusted by ISWDA to reflect errors or misunderstandings by the bidders. ISWDA does not reveal what the third bidder, National Resource Recovery, bid. ISWDA argues since neither XL or Seres met the 20% recovery rate, neither was responsive, and neither was unfairly disadvantaged. However, this ignores the effect on the third bidder, which ISWDA has not discussed. Further, it ignores the fact that the 20% requirement in the RFP may have influenced the other two bidders to pursue a certain design in order to achieve the requirement; and had they known the 20% rate was not binding, may have been able to have been the successful bidder for a MRF with a recovery rate of 10-15%. The difficulty in second-guessing who may have been the lowest responsible bidder had the requirements been different underscores the need that there be no material variances between the contract and the request for bids. When material changes are made, after the bids are submitted, the ISWDA no longer knows who the lowest bidder would have been (and thus the best bargain for the public) had accurate specifications and details been provided to the contractors.

Other areas of concern such as the provision of the RFP that other participation is prohibited, for liquidated damages, the forklift, the motor oil and batteries and the traffic study, any of which standing alone, after the requirements were varied, might not be fatal to the contract as any, standing alone, arguably may not be material variances but their mention serves to show the looseness of the total process which overall is flawed.

*Contract Price*

The most important variance is that between XL's bid and the contract price. After its bid was selected, XL was permitted by ISWDA to raise its contract price by $1.48 million. If this is not a

material variance then nothing is. ISWDA argues that XL's contract price is still millions of dollars less than Seres/CRC's bid, and this is true. However, the fact that a contractor submits the lowest bid will not necessarily require that the contractor be awarded the contract. *Armstrong v. Crystal Lake Park District* (2nd Dist. 1985), 139 Ill. App. 3d 991, 998. ISWDA had the discretion to determine the 'lowest responsible bidder,' based in part on whether the contractor would be able to discharge the obligations under the contract, and the bid's conformity with the specifications. *Armstrong*, 139 Ill. App. 3d at 998; Ill. Rev. Stat. 1989, ch. 34, par. 5—1022. Thus, just because XL's bid, even with a $1.48 million increase, is still lower than the other bid, does not automatically mean it is the lowest responsible [bid].

ISWDA again asserts that the 'modification' in XL's price occurred after it was selected. However, this practice, if permitted, leads directly to the problems that competitive bidding is meant to prevent. For example, if a contractor is permitted to increase its price after being selected as the lowest responsible bidder, what checks are there to prevent favoritism, corruption, and fraud? There is absolutely no indication that occurred here, but there is nothing imposed by the bidding process to prevent it. The problem of these variances, especially price, is a result of the final flaw of ISWDA's process: of not requiring a binding bid."

As the trial court's comment concludes, there is an interrelationship between the overall negotiability of the contract, the failure of the ISWDA to issue a sufficiently specific RFP, and the variations between the bid and the RFP, particularly those variations which resulted from post-bid modifications. XL argues there were no "material" variations between the bid and the RFP. We agree with the trial court that these variations are material and conclude that section 5—1022 of the Counties Code does not allow for the procedure utilized in this case.

As the case of *Sinram-Marnis Oil Co. v. City of New York* (1989), 74 N.Y.2d 13, 18, 542 N.E.2d 337, 338, 544 N.Y.S.2d 119, 120, points out, "the heart of this process must be public competition, not private negotiation." As a matter of law, there was no need for any post-bid negotiations in the case at bar. If ISWDA was unfamiliar with the variety of designs available, bids should first have been requested for design by engineering firms which would probably fit within the professional services exception of section 5—1022 of the Counties Code. Then, having a design which ISWDA found accommodated its needs, bids could be requested as to construction and operation. It may be that some contractors would not be able to bid because the design settled on by

ISWDA incorporated processes or equipment which they were unable to utilize for some reason. However, the ISWDA would have studied the design submitted and settled on the design most able to accommodate its needs. There would be no need to negotiate with the contractor. Either the contractor could build it or not, and if so, the price bid would not be negotiable. This is the process which the Illinois legislature has determined to provide the greatest protection for the public.

■ Although we conclude the requirements of section 5—1022 of the Counties Code and prior case law were violated as previously discussed, there is some merit to the argument that a governmental group such as the ISWDA should be allowed to have the bidders propose various designs for a facility which is to be constructed to solve a particular governmental need and the price to be charged. This would allow the governmental unit to select the bid, giving consideration to the feasibility of plans suggested and the costs. Thus, where only a few firms have the expertise to construct and operate a particular type of facility, a greater number of bidders would be obtained and the competition to present an economically feasible facility would keep the costs down. However, the development of such a scheme is for the General Assembly, not the courts.

In determining the propriety of the judgment on the pleadings in favor of plaintiffs, this court was also asked to decide whether ISWDA Ordinance No. 91—3 exempted the subject facility from the competitive-bidding requirements of section 5—1022 of the Counties Code. As XL conceded in its brief, this issue need only be considered if this court finds the MRF is a "similar transaction" not suitable to competitive bidding under section 5—1022 of the Counties Code. The trial court found, in essence, the MRF was suitable to the competitive-bidding process, the statute was not complied with, and ISWDA ordinance No. 91—3 could not cure the defect. Since this court agrees with the trial court that the MRF is not exempt from the competitive-bidding process, this issue need not be addressed.

■ The final issue to be addressed is whether the trial court erred in striking plaintiffs' petition for rule to show cause why defendants should not be held in contempt of court for violation of a court order. On February 20, 1992, plaintiffs filed a petition for rule to show cause why defendants should not be held in contempt of court because, even though the trial court's earlier judgment voided the contract between XL and ISWDA and the defendants were enjoined against performing the contract, the ISWDA, on behalf of itself and XL, submitted an application to the City of Champaign for site approval for the MRF, the application referred to the voided contract, the voided contract was submit-

ted as evidence at the site-approval hearing, plaintiffs made a written demand on defendants to withdraw the application for site approval, defendants refused to withdraw it, and plaintiffs alleged such acts of defendants were willful and contumacious. Defendants moved to strike the petition for rule to show cause, and has already been noted, the trial court granted the motion to strike the rule to show cause.

Based on an analysis of the relief sought by the petition for rule to show cause, this proceeding was one for indirect civil contempt. Therefore, the rules of civil procedure apply to this case. (See *In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 43-48, 558 N.E.2d 404, 415-19, *appeal denied* (1991), 136 Ill. 2d 541, 567 N.E.2d 328.) Since the trial court did not rule on the merits that the defendants were not in contempt, but granted the motion to strike the petition for rule to show cause, the standard of review is the same as for rulings on motions to strike or dismiss a complaint in a civil action, which is to say all well-pleaded facts are taken as true, with all inferences therefrom to be drawn in favor of the nonmovant, and the pleading should not be dismissed or stricken in its entirety unless it clearly appears that no set of facts could be proved under the allegations which would entitle the plaintiffs to relief. (*Meerbrey v. Marshall Field & Co.* (1990), 139 Ill. 2d 455, 473, 564 N.E.2d 1222, 1230; *Alderman Drugs, Inc. v. Metropolitan Life Insurance Co.* (1979), 79 Ill. App. 3d 799, 803, 398 N.E.2d 984, 987.) This is an issue of law which this court may consider independent of any ruling by the trial court. *Zientara*, 211 Ill. App. 3d at 235, 569 N.E.2d at 1303.

Defendants argue that plaintiffs' petition was legally deficient. The application for site approval was filed on September 16, 1991, well before the January 28, 1992, order of the trial court. Defendants' counsel represented to the trial court that the site application hearing was completed prior to the January 28, 1992, order and the only subsequent proceedings concerned the impact of that order on the site application. The City of Champaign determined the site application was not affected since the city was reviewing a particular facility for a particular site and that was independent of the contractual arrangements between ISWDA and XL.

Courts have the inherent power to use contempt proceedings to enforce their orders (*In re Marriage of Betts* (1989), 190 Ill. App. 3d 961, 965, 547 N.E.2d 686, 689), but such power is limited to cases of willful refusal to obey the court's order. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 285, 469 N.E.2d 167, 175.) While recognizing that the case of *O'Leary v. Allphin* (1976), 64 Ill. 2d 500, 356 N.E.2d 551, involves criminal contempt rather than civil contempt, the court's discussion in that case concerning the specificity of the injunction order is instructive. In

that case the court concluded, "an injunction order cannot support a finding of contempt unless it sets forth with certainty, clarity and conciseness precisely what actions are enjoined." *O'Leary*, 64 Ill. 2d at 513-14, 356 N.E.2d at 558.

In their reply brief, plaintiffs point out that although defendants filed a post-trial motion for clarification seeking guidance as to how the ISWDA could structure future arrangements for the design, construction, and operation of the MRF, that motion did not seek a determination as to the continued pursuit of the application for local site approval. Plaintiffs apparently never saw fit to raise that question either, and the trial court's order does not specifically enjoin the ISWDA's continued pursuit of site approval. The person best capable of deciding what the trial judge meant to enjoin by his order is the trial judge, and in ruling from the bench on the motion to strike the petition for rule to show cause, the trial judge stated it was not his intent to enjoin the site approval application. Since his ruling addressed the contract between the parties, the trial judge stated, "it wasn't necessary for me to implement that order to adopt some exclusionary rule prohibiting the use of information already acquired, particularly for the siting application process which was well underway at the time the matter was brought before the Court." If the trial judge never intended by his order to enjoin the site approval process, then defendants cannot possibly be in contempt of court.

Accordingly, the judgment on the pleadings entered in favor of plaintiffs and against defendants by the circuit court of Champaign County is affirmed in No. 4—92—0164; also affirmed is the order of the circuit court striking the petition for rule to show cause why defendants should not be held in contempt of court in No. 4—92—0202.

No. 4—92—0164, Affirmed.
No. 4—92—0202, Affirmed.

COOK and GREEN, JJ., concur.